*318 OPINION OF THE COURT
Morton I. Willen, J.
The plaintiff mother in this proceeding, M.A.B., applied to the court in June 1985, seeking to modify a judgment of divorce entered June 14, 1984. She wishes the court to permit her to move to Florida with her three children. The defendant father, R.B., cross-moved for a modification of the same divorce judgment, seeking to have sole custody of their 12-year-old son, B., awarded to him. He does not seek custody of the two younger children and opposes their removal to Florida. The matters were consolidated and a trial was held starting in March 1986, and concluded in May. The matter was reopened at the mother’s behest in September based on subsequent facts and finally completed in October.
The parties were married in 1970, separated in 1978 and divorced in 1984. There are three infant issue of the marriage, B., born November 27, 1973, J., born February 22, 1976, and T., born July 2, 1977. The judgment of divorce incorporated the parties’ stipulation which included the provision of joint custody of their three children but that the children were to reside with plaintiff mother permanently in the State of New York. In general, the parties have followed this custodial arrangement. There was a five-month period between February and June 1985, when B. resided with his father.
While the marriage between the parties was dissolved in an uncontested proceeding by reason of the abandonment of the mother by the father, the record indicates other problems in the marriage caused the breakup.
In May 1978, the defendant revealed to the plaintiff that he was a homosexual. Thereafter, the parties had a trial separation during which period they sought marital counseling. Ultimately the defendant indicated that he "could not in good conscience return” to their home and since 1978 has chosen to live with a male partner.
Since 1973, some five years prior to the revelation and separation, the mother has had severe health problems which she testified caused her to be hospitalized as an in-patient about 80 times in the past 10 years. These frequent hospitalizations have often resulted in the children being cared for by her parents, the defendant or his parents.
At the outset it is important to note that both parents love B. very much and B., in an in camera interview, stated he knew his parents loved him and that he also loved both of *319 them. He also stated his strong desire to remain with his mother expressing embarrassment and discomfort with the fact of his father’s homosexuality. Unfortunately, B. is a troubled young man. He admits to having school troubles as early as first grade, coinciding approximately with his parents’ separation. The mother testified that he got "harder and harder” to handle shortly after the parties divorced. School records indicate that he has been suspended from school numbers of times in recent years for being a poor school citizen (i.e., mooning the class, leaving class without permission, giving the finger, causing class disturbances, fighting, cutting class and sticking a classmate with a compass point). School records further indicate that B. did not pass any of his major seventh grade courses this year, with the exception of a "D” in one course and an "A” in physical education. B. was referred to the school’s Committee on the Handicapped in early 1986. The Committee did not classify him as educationally handicapped but judged that he had a serious lack of impulse control causing problems in school. The Committee urged counseling to focus on control of impulses and growth of self-esteem. B.’s out-of-school behavior has also been troublesome at times. At trial his mother testified that at age 10 he used alcohol which he took from the house. During the same year, B. removed $10 or $20 from his mother’s household which he gave to a friend for purchase of marihuana.
The father testified that in November 1984, upon returning from a European business trip, four calls from B.’s school were on his telephone answering machine. The father called Dr. Wayne Warren, then B.’s psychologist, about B.’s school suspensions. Dr. Warren, whose services were obtained by the mother when the school principal recommended counseling, saw the parents for some 3 or 4 sessions, was made aware of the family situation including the father’s homosexuality. The father indicated to Dr. Warren that he could change his job situation and travel less in order to be more available to help B. He asked Dr. Warren if it would be beneficial to B. if he were to move in with him. At a meeting in January 1985, of both parents, Dr. Warren, and B., the father presented the mother with the idea, recommended by Dr. Warren, that B. live with him. Initially, she agreed it would be positive, but then objected to the idea due to the fact that the father’s live-in partner would continue living there. The mother testified that three weeks later, in February 1985, she called the father saying that B. could stay with him on a trial basis to see if it *320 would help him psychologically. The father testified that she called to say she had been hasty in her objections that she could no longer handle B., and that B. could move in with him. Dr. Warren testified that he recommended that B. live with the father because B. was having problems in and out of school and that the mother was overwhelmed and could no longer handle him. In February 1985, B. went to live with his father where he remained until June 1985.
While in his father’s custody, B. was subjected to a more structured environment. Consistency improved. The father took a demotion on his job to be local and more available day to day for B. The father, working closely with B.’s teachers, jointly initiated a conduct card system whereby rewards would be given for improved behavior on B.’s part. Points were given or lost for good or bad behavior. According to the testimony of the father, B.’s teacher, Dr. Warren and B. himself, the system achieved some success. B.’s conduct and school work showed signs of improvement. A letter from the school principal on June 18, 1985, to the father contained her comment: "It is interesting to note that from April through June of this year, during the time B. was living with you his behavior was improved, indicated by the lack of referrals * * * Thank you so much for all your understanding and cooperation.” In June 1985, after a confrontation between the mother and the father about the mother’s planned relocation to Florida, during which the father announced his intention to fight the planned move, the mother refused to return B. to the father. Since June 1985, around the time this action was commenced, B. has been in the physical custody of his mother.
It is important to note that the school recommended counseling for B. and that B. stopped therapy in August 1985, shortly after he returned to her. The mother testified that it was painful for B. to talk with anyone but her, that she could not get him to go to therapy anymore, and that she became his therapist. She stated: "After we talk, he feels better. I consider me to be his therapist.” Evidently the boy’s problems became worse by the end of the trial in May 1986, and the mother found another therapist for the child. However, again the mother gave in to the boy’s desire that he be allowed to terminate therapy. While all of this was going on the boy was dropping one summer session course, barely getting by in another and the subject of further disciplinary proceedings at his school.
The father maintains that it would be in B.’s best interest if *321 an award of physical custody was made to him. The court agrees, and in so doing follows the standard enunciated in Friederwitzer v Friederwitzer (55 NY2d 89, 95): "The standard ultimately to be applied remains the best interests of the child when all of the applicable factors are considered, not whether there exists one or more circumstances that can be denominated extraordinary.” The record indicates that B. fared far better with his father than with his mother. B.’s father altered his job position to be more available to him. B.’s mother is frequently hospitalized (25 to 30 times in the last two years) with colitis and other ailments for periods of 1 to 2 weeks during which time B.’s care is left to the grandparents and friends. B. needs professional counseling, something which he has resisted for over a year, with the mother’s complicity, believing herself to be an adequate substitute, during which period B.’s behavior in school and home have deteriorated severely. That B. needs a guiding hand to see him through his difficulties in school is clear. His father has provided guidance by his effective use of the card-point system and his frequent contact with school officials, teachers, counselors and psychologists. B. has had problems on school field trips, even when accompanied by his mother. However, on a fifth grade trip to the Statue of Liberty when his father acted as a group leader, B. and his classmates wrote the father letters of thanks. On March 18, 1985, B. wrote to his father: "My classmates loved the trip and thought it was terrific * * * You made that day a nice day for everyone in my group. They all are telling me to pick them for my group if you have another trip. Love, B.” Another child wrote: "Thank you for being so nice to me, for buying me a drink, and taking me home. The best part of the trip was when we were high up on the stone thing. The whole trip was mint since you were my leader. From, T.N.”
J.F. wrote: "I was very happy that you can come with us to the Statue of Liberty. It was very fun when we went on the fairy [sic] coming back. It was fun when we had to come home. Thank you for everything you have done for us.”
L.B. wrote: "Thank you for being our group leader. I really enjoyed being in your group. Your [sic] really a nice leader thanks for everything. I enjoyed everything.”
B.’s father has demonstrated appropriate discipline and consistency which is needed by B. at this time in his life.
In contrast, B.’s mother has been unable to sustain the requisite wherewithal to deal effectively with the child’s manipulative tendencies.
*322 The mother testified that her frequent and severe health problems are a physical result of finding out that her husband had a male lover. Undoubtedly this is a contributing factor. However, the record indicates that she has had 80 hospitalizations since 1976, that her health problems date back to 1973, shortly after the birth of B. and predate her knowledge of her former husband’s homosexuality. Her medical problems are of such severity that she is totally disabled and receives $820 per month in disability payments. She testified she suffers from peritonitis, endomytriosis and colitis. She has had eight operations in 10 years, seven abdominal, one chest, and some 80 inpatient hospitalizations over this period and is on a large number of medications, pain-killers, mild tranquilizers, zyloprim, tranzene and percoset. While her physician of the last 12 years, Dr. Biasetti, testified her prognosis was good, "meaning not fatal”, a specialist, he asked her to consult in late 1982, wrote to Dr. Biasetti as follows:
"I think this girl is going to need the combined approach of toxicologists, neuropharmacologists, neurologists, psychiatrists and probably the use of transcutaneous stimulation and other techniques to avoid further dependence upon narcotics. I think the outlook is grim, and, of course, complicated by her complex marital situation.
Sincerely yours,
Henry D. Janowitz, M.D.”
No testimony was offered as to whether the combined approach recommended was ever followed by her.
With the mother suffering these myriad disabilities it is small wonder that she is overwhelmed with B. Additionally, since her parents have served so often as surrogate parents during her hospitalizations, they too must be scrutinized. Her father is 69 and suffers from diabetes and hypertension. Her mother is 61. They plan to retire to Florida. Mrs. B. has resided with them for the past 2 Vi years. It is self-evident that granting the mother’s request to relocate to Florida is tantamount to her parents having extraordinary custodial responsibility. In view of their age and health problems alone, this seems questionable.
The mother contends that B. is an impressionable adolescent who is well aware of, and strongly rejects, his father’s homosexuality. She argues that it is unavoidable that the father’s homosexuality would adversely affect B. if physical *323 custody were awarded to the father. The evidence is to the contrary. The father’s behavior has been discreet, not flamboyant. His relationship with his partner is apparently stable and of eight years’ duration. Testimony was given and not challenged that neither had engaged in any other homosexual relationships. The father acknowledges that B.’s sexual orientation is heterosexual, and he has stated he has no intention of interfering with this. That B. has conflicts with regard to his father’s homosexuality may not be ignored. These conflicts create anxiety which Dr. Warren testified require further therapy to be worked through. B. is difficult and defiant and acts out his anxieties. However, B.’s acting out behavior far outdates his awareness of his father’s sexual orientation, and, according to his former therapist, the boy faces not only this problem but the mother’s repeated hospitalizations as a source of major anxiety. B. has a tendency to blame himself for his father’s homosexuality and for his mother’s ill health, which Dr. Warren testified was understandable, if not normal. Accordingly, the court finds that the father’s homosexuality and the mother’s poor health have had an adverse affect upon B. Given the realities of reactions that may be anticipated from B.’s peers, the taunting, teasing and ostracism, B. will have genuine social pressure to grapple with and will require strength to integrate the fact of his father’s homosexuality into his own life. To accept that these problems are inevitable, is however, a long distance from saying that the father’s homosexual conduct has had an adverse affect upon B.
The court in M.P. v S.P. (169 NJ Super 425, 436-439, 404 A2d 1256, 1262-1263) addressed this issue:
"Plaintiff’s argument overlooks, too, the fact that the children’s exposure to embarrassment is not dependent upon the identity of the parent with whom they happen to reside. Their discomfiture, if any, comes about not because of living with defendant, but because she is their mother, because she is a lesbian, and because the community will not accept her. Neither prejudices of the small community in which they live nor the curiosity of their peers about the defendant’s sexual nature will be abated by a change of custody. Hard facts must be faced. These are matters which courts cannot control, and there is little to gain by creating an artificial world where the children may dream that life is different than it is.
"Furthermore, the law governing grants of custody does not yield to such narrow considerations. Of overriding importance is that within the context of a loving and supportive relation *324 ship there is no reason to think that the girls will be unable to manage whatever anxieties may flow from the community’s disapproval of their mother * * *
"If defendant retains custody, it may be that because the community is intolerant of her differences these girls may sometimes have to bear themselves with greater than ordinary fortitude. But this does not necessarily portend that their moral welfare or safety will be jeopardized. It is just as reasonable to expect that they will emerge better equipped to search out their own standards of right and wrong, better able to perceive that the majority is not always correct in its moral judgments, and better able to understand the importance of conforming their beliefs to the requirements of reason and tested knowledge, not the constraints of currently popular sentiment or prejudice.
"Taking the children from defendant can be done only at the cost of sacrificing those very qualities they will find most sustaining in meeting the challenges inevitably ahead. Instead of forbearance and feelings of protectiveness, it will foster in them a sense of shame for their mother. Instead of courage and the precept that people of integrity do not shrink from bigots, it counsels the easy option of shirking difficult problems and following the course of expedience. Lastly, it diminishes their regard for the rule of human behavior, everywhere accepted, that we do not forsake those to whom we are indebted for love and nurture merely because they are held in low esteem by others.
"We conclude that the children’s best interests will be disserved by undermining in this way their growth as mature and principled adults. Extensive evidence in the record upon which we have not commented amply confirms the trial judge’s finding that defendant is a worthy mother. Nothing suggests that her homosexual preference in itself presents any threat of harm to her daughters or that in the ordinary course of their development they will be unable to deal with whatever vexation may be caused to their spirits by the community.”
Supportive of this view is the decision of the United States Supreme Court in Palmore v Sidoti (466 US 429, 433 [1984]) wherein it was stated: "[The issue is] whether * * * private biases and the possible injury they might inflict are permissible considerations for removal of an infant child from the custody of its natural mother. We have little difficulty con- *325 eluding that they are not. The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.”
One commentator has recently outlined the reasons why homosexual parents are often denied custody. "The reasons given boil down to a few arguments: if gay parents have custody, they will molest the children; if gay parents have custody, they will turn the children into homosexuals; if gay parents have custody, they will perform sex acts in front of the children; if gay parents have custody, the children will be harmed because of the immoral environment.” (Rivera, Queer Law: Sexual Orientation Law In the Mid-Eighties, 11 U Dayton L Rev 275, 329.) Until the 1970’s, few homosexual parents were successful in custody cases. At the present time, some State courts, mostly in the southern and central portions of the United States, approach cases where homosexual parents seek custody "from a position of overt homophobia.” (Id., at 354.) See, Roe v Roe (228 Va 722, 324 SE2d 691, 694), where a father openly admitted that he was living in an active homosexual relationship. The Supreme Court of Virginia said: "The father’s continuous exposure of the child to his immoral and illicit relationship renders him an unfit and improper custodian as a matter of law.” (Supra, p 727, p 694.) Ten years ago, New York courts expressed the view that homosexual relationships were considered "clandestine deviate conduct” (Matter of Jane B., 85 Misc 2d 515, 520 [1976]). In that case, the court found that the homosexual relationship admittedly carried on by the mother and Lucy Q. in the apartment where the infant (10-year-old) female child, Jane B., resided created an improper environment for the child. The court further found that living with her mother while Lucy Q. lived there in a lesbian relationship with the mother was not for the best interest and welfare of the child. (Matter of Jane B., p 528.) However, more recent New York cases approach homosexuality from a more progressive standpoint. In Smith v Smith (3 Fam L Reptr 2692 [1977]) the New York Family Court in Richmond County required that a causal connection between lesbianism and its adverse effect upon the child should be shown. In Di Stefano v Di Stefano (60 AD2d 976 [1978]), the Appellate Division, Fourth Department, in conditioning the visitation of a lesbian mother with her children upon the total exclusion of the mother’s lover from any contact with the mother and children during such visitation, noted that: "[T]he *326 trial court found that homosexuality, per se, did not render [the mother] unfit as a parent.” Six years later, the Appellate Division, Third Department, adopted the language noted in Di Stefano in Guinan v Guinan (102 AD2d 963, 964 [1984]): "Specifically, the mere fact that a parent is a homosexual does not alone render him or her unfit as a parent.” In Guinan, the plaintiff husband offered testimony that the defendant mother had engaged in homosexual relations with other women during the marriage, at times in the presence of the children. A question of fact arose when conflicting evidence was introduced regarding whether the mother had engaged in sexual relations with other women. Citing Pawelski v Buchholtz (91 AD2d 1200), Matter of Saunders v Saunders (60 AD2d 701), Matter of Feldman v Feldman (45 AD2d 320), and Matter of Rodolfo "CC” v Susan ”CC” (37 AD2d 657), the Guinan court said: "[W]hether defendant had sexual relationships with other women is not determinative of this custody dispute. A parent’s sexual indiscretions should be a consideration in a custody dispute only if they are shown to adversely affect the child’s welfare” (p 964). The court was applying what is known as the "nexus test” whereby "the homosexuality of a parent should only be an issue insofar as the parent’s sexual orientation can be proven to have harmed the child.” (Rivera, op. cit., at 330.) Commentators in the family law area support this approach: "The soundest view requires that the parental conduct must be shown to have a direct adverse impact on the child.” (2 McCahey, Kaufman, Kraut, Gaffner, Silverman, Zett, Child Custody and Visitation Law and Practice, § 10.09[1], at 10-100.) Other States follow the nexus test. "A finding that a parent is unfit to further the welfare of the child must be predicated upon parental behavior which adversely affects the child.” (Bezio v Patenaude, 381 Mass 563, 410 NE2d 1207, 1216 [1980].) In Bezio, the Supreme Judicial Court of Massachusetts found no support for the trial court’s finding that a lesbian household would adversely affect the children. (Bezio v Patenaude, supra, p 1215.)
In the instant case, the plaintiff mother attempted to show that the father’s homosexuality has a direct adverse impact on the children. She testified that the children have seen their father and his partner A. in bed together. The evidence indicates only that one child, T., the youngest, may have gone into the father’s bedroom when the father and A. were in bed. According to T.’s in camera testimony, both men were in bed wearing pajamas, A. was sleeping and she thought it was *327 funny that A. was bald. There is no contention that anything of a sexual nature occurred. The court finds that this bedroom incident, if it actually occurred, does not sufficiently show adverse impact on nine-year-old T. "Presumption of harm to the child based on bias or mere speculation should not be indulged by the courts.” (Child Custody and Visitation Law and Practice, op. cit., at 10-101.) Applying the nexus test as articulated by the Appellate Division in Guinan (supra) to the instant case, the court finds no evidence of any present or potential harm upon which to make the father’s homosexuality a consideration in this custody dispute. In all events the father is seeking custody only of B., contending that the remaining children do not have the serious problems displayed by B.
The most recent New York case involving a homosexual father seeking child custody and visitation is Gottlieb v Gottlieb (108 AD2d 120 [1985]). In that case, the First Department struck two restrictive paragraphs and modified one paragraph from the judgment which dissolved the marriage between the parties and awarded custody of the seven-year-old child to the mother and visitation to the homosexual father. The court excised portions of the judgment which conditioned the father’s visitation privileges upon the total exclusion of his lover or any other homosexuals during visitation periods in the father’s home and upon the total exclusion of his lover or any other homosexuals from any contact with the (father) and child outside his home. The court said: "[T]he daughter must be fully conversant with the fact that her father has a live-in male lover, and that excluding the lover as a condition of visitation serves no real purpose other than as a punitive measure against the father.” (Gottlieb v Gottlieb, supra, p 122.) The court also excised a section of decretal paragraph 12 which had stated that " 'during defendant’s periods of visitation the child will not be taken to any place where known homosexuals are present’ ”, but let stand the section which said " 'nor will defendant involve the child in any homosexual activities or publicity’ ” (p 122). This section was left to stand because the father had advertised in the Village Voice for a homosexual relationship. The Gottlieb court found that the father used poor judgment in placing such an ad and that the child, by answering the apartment phone, might become a part of the father’s activities. Thus, the Appellate Division sees no adverse impact on a child when a homosexual father has his child visit and his lover or other homosexuals are *328 present. In a concurring opinion in Gottlieb, Justice Kassal stated that ”[t]he child should not be subjected to experiences which will unduly complicate or distort her understanding of her relationship to her parents or others. This applies equally to heterosexual or homosexual activity.” (108 AD2d, at p 123.) Turning to the instant case, the record shows no evidence that the B. children are subjected to the kind of experiences about which Justice Kassal was referring. The father, R.B., does not flaunt his homosexuality. During the five months he lived with his father, B. generally went to bed at 9:00 p.m. and A. came in later. Most mornings the father and B. left at 7:15 a.m. when A. was still asleep. A. testified that he and the father never embrace or touch in front of the children. Dr. Warren testified that the father’s conduct is decorous, not blatant. There is no evidence to the contrary.
It is important to note that Justice Kassal extended his remarks to heterosexual as well as homosexual activities. While Mrs. B. has had a boyfriend who lived in on weekends —no adverse impact upon any of the children has been suggested. Such activities, whether in a homosexual or heterosexual relationship, cannot be considered improper unless the children are emotionally affected.
In Bezio v Patenaude (410 NE2d, at p 1215) where a lesbian mother was opposed by the children’s guardian in a custody case, the Trial Judge reached the conclusion that " 'a Lesbian household, creates an element of instability that would adversely [a]ffect the welfare of the children.’ ” The Supreme Judicial Court of Massachusetts, the State’s highest court, reversed, stating that the Judge’s finding was insufficient to support the Judge’s conclusion that custody should remain in the guardian. The record did not support an inference that the mother’s lesbianism would render her unfit to further her children’s welfare. Another Massachusetts case (Doe v Doe, 16 Mass App 499, 452 NE2d 293 [1983]) reached the conclusion that a mother’s homosexual relationship did not preclude granting of joint custody of her child to her. There, the court found no evidence to show that the mother’s homosexual lifestyle would adversely affect the nine-year-old male child. In Medeiros v Medeiros (8 Fam L Rptr 2372 [1982]), a Vermont court, in determining whether the homosexual mother or heterosexual father would better serve the interests of the children, was unable to find that either of the parties has not (been) or would not be a proper custodial parent. Since the two boys, ages 8 and 11, were primarily taken care of by the *329 mother, who provided them with emotional support throughout the marriage and during the period of separation, and since the boys were thriving in their mother’s care at the time of the court’s decision, the court awarded sole custody of the children to the defendant mother. The court found that the mother’s homosexuality presented no substantial risk of harm to the children. Two years later, the father, who had married since the divorce, attempted a custodial change asserting that he was able to provide a better home than the mother. The mother moved to dismiss the father’s motion for a change of custody. The motion was dismissed after a short, 13-minute hearing. (See, Judge’s Log, Medeiros v Medeiros, Vt Super Ct, Bennington County, Nov. 26, 1984.) Similar results can be found in other neighboring States. See, DeBoise v Robinson (No. C-9104 Del Fam Ct, New Castle County, Nov. 17, 1980), cited in Rivera (op. cit, at 355) where a lesbian mother was awarded custody and the court imposed no restrictions on her living arrangement with another woman, and M.P. v S.P. (169 NJ Super 425, 404 A2d 1256, supra) where a mother’s homosexuality and accompanying embarrassment to children were held not proper grounds for removal of custody. On the West Coast, the State courts of Washington and California have provided guidance in this area of the law. In Matter of Marriage of Cabalquinto (100 Wn 2d 325, 669 P2d 886 [1983]) the parties were married, had a son, and later divorced in Colorado. The divorce decree granted custody to the heterosexual mother with liberal visitation rights to the homosexual father. The mother remarried and moved to Washington and the father moved to California where he lived with a homosexual lover. The father decided he wanted his young son to visit in California and the mother refused. The father moved in a Washington State court to have his Colorado visitation rights enforced. The Trial Judge, in an oral opinion, refused to grant visitation in California stating a strong antipathy to homosexual living arrangements. " '[A] child should be led in the way of heterosexual preference, not be tolerant of this thing [homosexuality] * * * it can[not] do the boy any good to live in such an environment. It might do some harm.’ ” (Matter of Marriage of Cabalquinto, supra, p 328, p 888.) In remanding the case to the lower court for further consideration, the high court of Washington was emphatic: "We now make specific the rule of law which was subsumed in the decision in Schuster v. Schuster, supra: homosexuality in and of itself is not a bar to custody or to reasonable rights of visitation. This *330 rule is consistent with the decisions of other state courts” (p 328, p 888). The court said that there was no evidence that a visitation of substantial periods in the summer months would endanger the physical, mental, or emotional health of the child. Visitation of such a duration was seen as reasonable and something which must be determined with reference to the needs of the child rather than the sexual preference of the parent. The California case of Batey v Batey, reported about in the New York Times, July 1, 1986, is a complex homosexual father-child custody case which involved proceedings in Colorado and California. Frank Batey, a homosexual, and Betty Lou Batey, a fundamentalist Christian, parents of a son, Brian, were divorced in California in 1980 and Betty Lou was given custody of Brian, then age nine. Frank was granted liberal visitation. In 1982 custody was changed to Frank, primarily because Betty Lou denied Frank visitation. Eleven days after the custody change, Betty Lou vanished with Brian for 19 months until she was found in Colorado in 1984. When she refused to produce the child, she was jailed for contempt. Colorado returned Brian to California and, in a complex case which involved kidnapping, contempt, and custody, San Diego County Superior Court Judge Judith McConnell determined that neither parent should have custody but only visitation. Judge McConnell decided that Brian would be in "grave danger” with the mother, who had caused him to form strong views opposing his father’s homosexuality and who had failed to provide him with any education during the 19-month abduction. The Judge also decided that since the boy’s views about his father were so deeply entrenched, a temporary foster home was in his best interest. Finally, at a closed hearing on June 18, 1986, Judge McConnell awarded Frank Batey custody of Brian, now age 15. Judge McConnell said that the father was better able to meet the needs of the boy.
Since Domestic Relations Law § 240 (1) gives the court great discretion in making custody decisions, Judges often seek expert opinions. The court here relies on the testimony of Dr. Wayne Warren, B.’s former therapist. Dr. Warren saw B. 42 times and the parents six times from June 1984, until August 1985. In February 1985, he recommended that B. live with his homosexual father because he offered more consistency. The court is also mindful of the expert opinions from two cases already mentioned regarding the effect that homosexuality has on parenting skills. In Bezio (supra, at pp 1215-1216) the court relied on the testimony of Dr. Alexandra Kaplan, a *331 clinical psychologist and professor of psychology at the University of Massachusetts: " 'There is no evidence at all that sexual preference of adults in the home has any detrimental impact on children . . . [M]any other issues influence child rearing. Sexual preference per se is typically not one of them * * * [M]ost children raised in homosexual situation^] become heterosexual as adults . . . There is no evidence that children who are raised with a loving couple of the same sex are any more disturbed, unhealthy, [or] maladjusted than children raised with a loving couple of mixed sex.’ ”
In Doe (supra, at p 296) the court said: "Four psychiatrists testified at trial. As put by the trial judge, and the record supports him, 'three of these people were of the opinion that the [homosexual] wife’s lifestyle, in and of itself, would not adversely affect the minor child should the wife be awarded some form of custody.’ [Note: The fourth psychiatrist was not credible because he had no supporting studies and his exposure to homosexual parents was limited.] Further, one of these three witnesses testified to a study he had conducted comparing single parent heterosexuals with minor children to single homosexual parents with minor children. He found 'no difference in the minor children and no evidence of sexual dysfunction to a minor child reared by a single homosexual parent.’ ” The court finds that R.B. is a caring, worthy father. His homosexuality is not flaunted and has no adverse deleterious effect on his 12-year-old son. In view of the cases cited, the court finds that it is impermissible as a matter of law to decide the question of custody on the basis of the father’s sexual orientation. The guiding consideration must be B.’s best interest. At this time, B.’s needs can best be met by his father. B. shall reside permanently with his father, R.B., in the State of New York. R.B. shall have day-to-day control over B.’s actions and M.A.B., the boy’s mother, shall have liberal visitation with B. away from the custodial residence. The parents shall consult with each other with reference to items of major importance affecting the health, welfare and education of B., especially counseling. Both parents shall have input on all major decisions involving B.
As B. is now to reside with his father, this would necessitate his being separated from his brother and sister. While this may be painful for all involved, B.’s best interest will be served by his removal from the residence of his mother, brother and sister. The recent Appellate Division case of Matter of Estes v Estes (112 AD2d 568) held that the separa *332 tion of siblings is discouraged, but, when it is clear that the best interest of each child lies with a different parent, a split custody decree is proper. The evidence supports such a decree. B. needs the motivation and consistency that his father can provide. J. and T. appear to be more self-motivated and present neither behavioral problems nor difficulties in school. The record shows that B. did well when he resided with his father for the five-month period in 1985. The children were able to spend time together during visits with each parent. In this case, there is a clear necessity based on the circumstances that compels the court to direct that the children be separated for now.
Plaintiff mother wishes to relocate to Florida with her three children. Inasmuch as the court has directed that B. shall now be in the physical custody of his father, this application concerns moving only with J. and T. According to her testimony, the mother’s reasons for going include her need to separate further from her former husband for her own emotional and physical well-being, the economic advantages of cheaper housing, and the fact that her parents are going there. In New York, absent a showing of exceptional circumstances, such a move is not permitted when it would effectively deprive the noncustodial parent of regular access to the children. Here, the court finds no such showing of exceptional circumstances. Both parents need to be near B., J. and T., and the children need to be near their parents. Plaintiff mother’s physician, Dr. Biasetti, testified that, while a move further away from her former husband may be beneficial, it "does not have to be Florida” and that her prognosis is good, basically, even if she stays in New York. Dr. Wayne Warren, when asked whether he thought B. should live with her in Florida, testified: "[H]e should not be separated [from his father] that far [Florida]”, and that it would be "more difficult for B. to stay in New York if his mother goes to Florida”. As for the mother’s financial situation, it is clear that she is much better off now than at the time of the divorce. The stipulation and decree provide her with $640 per month child support and maintenance. However, subsequent to the divorce the mother has been receiving disability payments of an additional $820 per month. The court concludes that the basic motivation for the plaintiff’s desire to relocate to Florida is the pending move there by her parents with whom she resides and the fact that she already has a sister residing there. Apparently still another sister resides here in New York.
*333 The predominant concern in resolving custody disputes is the child’s best interests (Domestic Relations Law §§ 70, 240). It is firmly established policy in this State that wherever possible, the best interests of a child lie in his being nurtured and guided by both parents (Daghir v Daghir, 82 AD2d 191, 193 [2d Dept 1981], affd 56 NY2d 938 [1982]). Noncustodial parents and their children jointly enjoy a natural right of visitation, which to be effective, must be frequent and regular (Daghir v Daghir, supra; Weiss v Weiss, 76 AD2d 863 [2d Dept 1980], affd 52 NY2d 170 [1981]). While custodial parents are entitled to further their own interests and develop their own lives, they may not do so at great cost to the relationship between noncustodial parents and their children (Bryan v Bryan, 99 AD2d 743 [2d Dept 1984]). Disruption of the latter relationship by relocation of the custodial parent to a distant jurisdiction will not be permitted unless a compelling showing of "exceptional circumstances” (Strahl v Strahl, 66 AD2d 571, 574 [2d Dept 1979], affd 49 NY2d 1036 [1980]) or "pressing concern” for the welfare of the custodial parent and child (Milici v Milici, 57 AD2d 946 [2d Dept 1977]) is made warranting removal of the child to a distant locale (Courten v Courten, 92 AD2d 579, 580 [2d Dept 1983]). The term "exceptional circumstances” is usually associated with a situation where either the exercise of such right is inimical to the welfare of the child or the parent has in some manner forfeited his or her right to such access (Strahl v Strahl, supra, p 574; Litman v Litman, NYLJ, Feb. 28, 1985, p 15, col 1 [Sup Ct, Kings County, Schneier, J.). There have not been such "exceptional circumstances” here.
For all these reasons the court finds that plaintiff mother has not shown the requisite exceptional circumstances and her application to modify the judgment of divorce to allow the removal of any of the children to Florida is denied.