Jon Waldemar JOHNSON,
Plaintiff and Appellee,

v.

Dianne Helen SCHLOTMAN, f/k/a
Dianne Helen Johnson, Defendant
and Appellant.

Civ. Nos. 910236, 920255.

Supreme Court of North Dakota.

July 1, 1993.

Thomas J. Aljets of Heinley & Aljets, Carrington, for plaintiff and appellee. Appearance by Jon W. Johnson.

William Kirschner of Kirschner Law Office, Fargo, for defendant and appellant. Appearances by Laurie Miller Kirschner, Ella Huwe, and Dianne Schlotman.

Paula L. Ettelbrick of Lambda Legal Defense and Educ. Fund, Inc., 666 Broadway, New York City, and Erica M. Ryland of Weil, Gotshal & Manges, New York City, for amicus curiae, Lambda Legal Defense and Educ. Fund, Inc.

VANDE WALLE, Chief Justice.

Dianne H. Schlotman appealed from an amended judgment which temporarily terminated her visitation rights with her two children and denied her motion for a change of custody, and from an order which denied her motion for a new trial. We affirm the judgment but remand for further proceedings, and affirm the order denying the motion for a new trial.

Dianne and Jon W. Johnson were married in 1974. A daughter, currently age 14, and a son, currently age 11, were born during the marriage. Dianne and Jon entered into a stipulated divorce settlement in 1986 which provided the parties would have joint legal custody of the two children and, for the most part, unspecified visitation. The children continued to live with Jon in Glenfield, North Dakota. Dianne eventually moved to Fargo.

After the divorce, Dianne moved in with Ella Huwe, her partner, and informed the children that she was a lesbian. Dianne's sexual orientation eventually became the center of continuing disputes between Dianne and Jon, with Jon alleging that it had an adverse effect upon the children's well-being, and Dianne alleging that Jon was turning the children against her due to his bias against homosexuals. Dianne, perceiving that Jon was interfering with her visitation rights, prepared a motion for modification of visitation in August 1990 which called for a more specific and precise visitation schedule.[1] Jon's reply asked the court to rescind all of Dianne's residential care and visitation of the children unless Dianne ceased her cohabitation with Ella, Dianne's partner, and ceased discussing, promoting, or displaying her sexual orientation to the children. After these motions were not acted upon, new, but essentially similar, motions for modification of custody and visitation were filed in early 1991.

In February 1991, an order appointing a guardian ad litem for the purpose of visitation was issued by the trial court. The order forbade the guardian ad litem to take the children to Dianne's residence if Ella continued to reside there, prohibited the children from having any contact with Ella, and prohibited both parties from discussing Dianne's sexual activities in the children's presence.

A hearing was held on March 7 and April 16, 17, 18, and 22, 1991. At the hearing, twenty-four individuals testified, including psychologists and counselors. An amended judgment was entered in July 1991 which temporarily discontinued Dianne's visitation and residential care of the children. The order also provided that the children were to seek the counseling of Dr. Douglas Knowlton, a psychologist, and that Jon and Dianne were to comply with any of Dr. Knowlton's reasonable requests pertaining to the children's treatment. Dr. Knowlton was to decide when visitation and contact with Dianne was to resume and what limitations were to be imposed. Dianne appealed this amended judgment.

After the appeal was perfected, Dianne filed a motion for a new trial with the trial court alleging as "newly discovered evi-

---

1. This motion is not a part of the official trial court record, but apparently it was received by Jon, as his reply is in the official record.

dence" that Dr. Barrett, the one psychologist who testified for Jon, had been reprimanded by the North Dakota State Board of Psychologist Examiners for his work done in the case.

On November 27, 1991, we ordered "that the case be remanded for the limited purpose of considering the Motion for a New Trial and that the appeal [of the amended judgment] be held in abeyance pending final determination of that Motion."

On February 10, 1992, the trial court issued an order for temporary visitation which allowed Dianne unsupervised visitation of the two children at her home or any other suitable place at certain and specific times. The order provided that Dr. Knowlton continue as the children's psychologist and that he meet weekly with the children and the families involved, and that he do everything possible to continue to assist the families in resolving their problems.

On remand from this Court, the trial court summarily denied Dianne's motion for a new trial, and issued a separate order for temporary visitation on July 10, 1992 which, like the February 10, 1992 order, allowed unsupervised visitation and continued treatment by Dr. Knowlton.

Dianne appealed the denial of her motion for a new trial on August 24, 1992.

## I.

■ A trial court's decision to modify custody is a finding of fact subject to the clearly erroneous standard of review. *Blotske v. Leidholm,* 487 N.W.2d 607 (N.D. 1992). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. Rule 52(a), NDRCivP; *In re Estate of Dittus,* 497 N.W.2d 415 (N.D.1993); *Blotske, supra.* In carefully reviewing the entire record, we are unable to deem the trial court's refusal to modify custody clearly erroneous.

The trial judge heard testimony that, prior to the divorce, Dianne informed Jon that she was a lesbian. The children, however, were not told. After the divorce, the children visited Dianne and generally enjoyed her company. In 1989, Dianne introduced the children to Ella, Dianne's lesbian partner, and also informed her daughter that she, Dianne, was a lesbian and had a special relationship with Ella. The daughter, naturally curious, asked many questions about Dianne's homosexuality but appeared to generally accept it. At a later date, her son was likewise informed of Dianne's homosexuality and her relationship with Ella.

At some point after the children were told of Dianne's sexual orientation, the children began having problems with depression and inability to sleep. Dianne submitted testimony that the children's problems stemmed from Jon's bigotry with regard to homosexuals which poisoned the children's minds against Dianne. Jon submitted testimony that the problems stemmed from school and societal discrimination against homosexuals, and that his attitude was not the root of the children's problems, although he personally considered homosexuality deviant behavior that should not be tolerated.

Dianne attempts to minimize this testimony by accentuating her testimony that Jon poisoned the children's minds against Dianne and her homosexuality. Although Dianne characterizes this case as solely one of discrimination based upon sexual orientation, it is not. Both Dianne and Jon presented the testimony of experts who extensively analyzed the obstacles children of a homosexual parent face and the propriety of custody stemming therefrom. But other telling evidence was also presented. The court did not find that both parents are equally suitable to assume a custodial role or that the evidence requires a change of custody to Diane if it were not for her sexual preference. There is ample additional testimony supporting the trial judge's finding that visitation and residential care remain with Jon.

Section 14-09-06.2, NDCC, sets forth the factors to be considered in determining the best interests and welfare of the children for purposes of child custody. The daughter, age 12 at the time of trial, testified to her very strong preference to not live with Dianne. The daughter explained that Dianne refused to listen and attend to her needs, that she was embarrassed to be around her mother, that she was afraid her mother and Ella would display their affection publicly, that she wanted to continue to live in Glenfield where her friends and school were, and that she had a strong relationship with Jon and his new wife. *See* NDCC § 14-09-06.2(1)(i).

Testimony also revealed that the children have lived with Jon in Glenfield their entire lives, and have attended no other school than that in Glenfield. The stable and satisfactory environment with Jon was clearly shown, as was evidence of a permanent family unit with Jon and his new wife, Sherry. *See* NDCC §§ 14-09-06.2(1)(d), 14-09-06.2(1)(e).

Evidence of the love, affection, and emotional ties between the children and Jon was introduced a number of times. The daughter expressed her great love for Jon, and testified that she considered Jon's new wife to be her mother and best friend. The children testified that they disliked Ella and wanted nothing to do with Dianne. *See* NDCC §§ 14-09-06.2(1)(a), 14-09-06.2(1)(k). Some of this testimony obviously is rooted in Dianne's sexual orientation and Jon's announced disapproval of her lifestyle. But it cannot be summarily discounted.

■ When a trial court entertains a motion to change custody of children of divorced spouses, the judge must determine two issues: whether or not there has been a significant change in circumstances since the original divorce decree and custody award and, if so, whether or not those changed circumstances compel or require a change in custody to foster the best interests of the child. *Barstad v. Barstad,* 499 N.W.2d 584 (N.D.1993); *Gould v. Miller,* 488 N.W.2d 42 (N.D.1992); *Orke v. Olson,* 411 N.W.2d 97 (N.D.1987). As the party

seeking the change, Dianne has the burden of showing both that a circumstance changed significantly and that this change so adversely affected the child that custody should be changed. *Gould, supra; Lapp v. Lapp,* 336 N.W.2d 350 (N.D.1983).

■ There are changed circumstances in this case: Jon remarried, Dianne informed the children that she is a lesbian, Dianne resides with her lesbian partner, and the children refuse to exercise their visitation with Dianne. Even if the trial court were to ignore Dianne's homosexuality, the evidence presented is sufficient to sustain a conclusion that the best interests of the children are best served by continued custody with Jon—especially in light of the stability of the custodial home and the relationship the children have with Jon, the custodial father. *See Barstad, supra; Delzer v. Winn,* 491 N.W.2d 741 (N.D. 1992); *Blotske, supra.*

A parent does have a duty to not turn a child away from the other parent by "poisoning the well." Notwithstanding the perceived imperfections in the other parent, a custodial parent should, in the best interests of the children, nurture the children's relationship with the noncustodial parent. The record before us reflects that Jon has exposed the children to his belief that homosexuality is deviant and is not to be tolerated. This view is not Jon's exclusively nor does the record convince us that the trial judge made a mistake when it found that Jon has not poisoned the children's minds nor is the sole cause of the children's discomfort with Dianne and Ella. Although Jon is accountable for his own actions, we cannot hold him to answer for the views of others.

Nor is it the function of the courts to use these children as the tool of enlightenment to convince society of the error of its beliefs. Rather, the function of the courts in matters of child custody is to look solely to the best interests of the particular children in the case before the court. We readily agree that bigotry, in whatever form, on the part of a parent is a matter affecting the best interests of the children, for it affects the capacity and disposition of that

parent to give guidance to the children. NDCC § 14-09-06.2(1)(b). However, unless we were to hold, which we do not, that bigotry as a matter of law transcends all other factors applicable to the best interest of the children, we cannot, under our standard of review, reverse this custody order.

Our review of the testimony and record reveals that the trial court's determination that the best interests of the children required the denial of Dianne's motion to modify custody was not clearly erroneous.

## II.

■■■ A trial court's determination to deny modification of a visitation order is considered a finding of fact which will not be reversed unless it is clearly erroneous. *Vande Hoven v. Vande Hoven*, 399 N.W.2d 855 (N.D.1987). Like custody, visitation is primarily concerned with the best interests of the child. *Muraskin v. Muraskin*, 336 N.W.2d 332 (N.D.1983). Unlike custody, visitation between a child and a noncustodial parent is not merely a privilege of the noncustodial parent, but a right of the child, and the noncustodial parent is deprived of visitation only if "visitation is likely to endanger the child's physical or emotional health." *Dschaak v. Dschaak*, 479 N.W.2d 484, 487 (N.D.1992) *quoting* NDCC § 14-05-22(2).

The amended judgment suspended the children's visitation and residential care with Dianne, and directed that Dr. Knowlton decide when and under what circumstances visitation and contact with Dianne were to resume. The judgment temporarily discontinued all contact between Dianne and the children, leaving the future contact to the discretion of one psychologist.

■■■ Because minor children are entitled to the love and companionship of both parents insofar as this is possible and consistent with their welfare, *Gardebring v. Rizzo*, 269 N.W.2d 104 (N.D.1978), we recognize that a healthy relationship between a parent and child may necessarily depend upon and develop through regular visitation. Here we are concerned that the trial court overstepped its bounds by terminating all visitation. To justify such an onerous restriction on visitation, physical or emotional harm resulting from the visitation must be demonstrated in detail, and we will not simply assume or surmise such harm. *Hanson v. Hanson*, 404 N.W.2d 460 (N.D.1987). An order denying visitation must be based on the preponderance of the evidence. *Healy v. Healy*, 397 N.W.2d 71 (N.D.1986). Absent a detailed demonstration of harm, such a restriction appears punitive. Although the children are upset and confused about Dianne's homosexuality, it is questionable whether this state of mind rises to the level of endangerment to the children's physical or emotional health. NDCC § 14-05-22(2). *See also Haus v. Haus*, 479 N.W.2d 474 (N.D.1992); *Dschaak, supra. Cf. Blew v. Verta*, 617 A.2d 31 (Pa.Super.Ct.1992) [where there is no harm to child and the child likes homosexual mother and has a strong relationship with her, restricting visitation based upon homosexuality is improper]; *Conkel v. Conkel*, 31 Ohio App.3d 169, 509 N.E.2d 983 (1987) [mother's challenge to homosexual father's overnight visitation with child properly denied absent evidence of harm]; Caroll J. Miller, Annotation, *Visitation Rights of Homosexual or Lesbian Parent*, 36 A.L.R.4th 997 (1985 & Supp.1992).

However, after the amended judgment was issued, the trial court issued further orders which provided regularly-scheduled, unsupervised, overnight visitation between Dianne and the children, and ordered continued psychological treatment.[2] We therefore consider the amended judgment in light of these subsequent orders.

## III.

The amended judgment ordered that:

"Jon shall contact Dr. Douglas Knowlton ... for the purpose of starting counseling to help the children deal with the

---

2. The parties have not appealed the subsequent orders issued by the trial court after Dianne's first appeal had been perfected. Nor do the parties question the trial court's jurisdiction in issuing the orders after the appeal was perfected and after we remanded the case for the limited purpose of entertaining the motion for a new trial.

various problems the children have been experiencing involving visitation and contact with Dianne. Neither Jon, nor Dianne, nor Jon's spouse, nor Dianne's committed partner, shall interfere with the counselor in working with the minor children. Jon and Dianne shall comply with any reasonable recommendations made by the counselor; which recommendations the counselor feels are necessary in working with the children."

Under the circumstances of this case, we believe the trial court should monitor its order of continuing psychological treatment. The trial court should periodically review and inquire into the treatment, and note any changes in the children's progress which may affect custody or future visitation, particularly in view of the fact that the trial court's visitation order reflects it relied upon Dr. Knowlton's recommendations. The amended judgment provides that either parent may bring a motion to the court to discontinue counseling if after a reasonable time "it becomes apparent that counseling is not working." Here, because of the obvious distress of the parties and the children, the court believed that psychological treatment is necessary and ordered such treatment. It should monitor the psychological reports to determine if the counseling is achieving its desired effect. If it is not achieving its desired effect, the court should order appropriate changes in treatment or care of the children. *Cf.* Rule 35, NDRCivP. We remand to the trial court for this determination.[3]

### IV.

This matter consolidates two appeals. In the second, separately-docketed appeal, Dianne alleged that the trial court erred in denying her motion for a new trial based upon newly discovered evidence. Because Dianne has not briefed this issue, we assume she has abandoned the claim, and we have the authority to dismiss the appeal pursuant to Rule 31(c), NDRAppP. *Cf.*

*Pioneer Credit Co. v. Latendresse,* 286 N.W.2d 445 (N.D.1979). Furthermore, as the post-appeal orders in this case illustrate, a motion for a new trial based upon the discovery of new evidence in custody and visitation cases is inappropriate because the continuing jurisdiction of the trial court in custody matters allows for a modification hearing when new evidence is adduced. *See Blotske, supra; Vande Hoven, supra; Voskuil v. Voskuil,* 256 N.W.2d 526 (N.D.1977). Therefore, the preferred method a party in Dianne's position should employ when new evidence is discovered is a motion for modification, not a motion for a new trial. In any event, a trial court's denial of a motion for a new trial is purely discretionary, and we will not disturb it on appeal unless there is an affirmative showing of a manifest abuse of discretion. *Kraft v. Kraft,* 366 N.W.2d 450 (N.D.1985). In light of the record, we see no manifest abuse of discretion, and we affirm the order denying the motion for a new trial.

The amended judgment of the trial court is affirmed, but we remand with instructions to the trial court to monitor the court-ordered psychological reports.

SANSTROM, NEUMANN and MESCHKE, JJ., concur.

LEVINE, Justice, concurring.

I write to concur and to express my reasons for doing so, some of which parallel those of the majority.

By now, we, lawyers and judges, recognize that change-of-custody proceedings are wholly different animals from original custody ones. Considerations of finality guard against modifications of prior custody decrees, *see Von Bank v. Von Bank,* 443 N.W.2d 618 (N.D.1989), and in change-of-custody proceedings, the emphasis is on the continuation of the stability of the children's relationship with their custodial parent. *E.g., Blotske v. Leidholm,* 487 N.W.2d 607 (N.D.1992). Only if it is "compelled" or "required" in the children's best interests, should a change of custody occur

---

3. Because the trial judge who heard this matter has retired, the presiding judge will assign a new judge on remand.

and interrupt the children's custodial relationship with their custodial parent. *E.g., Barstad v. Barstad,* 499 N.W.2d 584 (N.D. 1993). That is the message, loud, clear and consistent, that we have trumpeted in *Orke v. Olson,* 411 N.W.2d 97 (N.D.1987); *Delzer v. Winn,* 491 N.W.2d 741 (N.D.1992); and *Blotske v. Leidholm, supra.* So, noncustodial parents challenging custody are forewarned that theirs is a daunting, arduous task. They must prove not only that something of importance has changed significantly, but that this change has so adversely affected the children that custody must be changed. If this sounds ominous and discouraging to challengers of custody, it is intended to. We do not entertain lightly the proposed disruption of the continuity of care and custody and our aversion to changing custody sets the backdrop for any parent challenging the custodial status quo.

Having elaborated and set out the prologue for all change-of-custody dramas, I am certain that Dianne approached her onerous task of convincing the factfinder to change custody with the evidence she considered sufficient to defy the odds, overcome the presumption, indeed, bias, in favor of maintaining custody and accomplish what some might say was nigh on a miracle. However, Jon, too, mounted his defense, and a vigorous one it was. And the factfinder chose which witnesses, which evidence, which party to favor. That is what trial judges are for.

I certainly agree with Dianne that, if Jon, in fact, poisoned the children's minds and hearts with his unyielding, uncharitable intolerance of homosexuality, a change of custody would be required to protect the children's best interests. Preventing the unhealthy and, indeed, intolerable disruption of children's love and affection for their noncustodial parent, is an absolute duty of the custodial parent. Indeed, some members of this court have even condoned granting custody to a parent because his visitation was made "difficult" by the custodial parent. *See Gravning v. Gravning,* 389 N.W.2d 621 (N.D.1986). However, transfer of custody is a last resort to remedy a recalcitrant parent's habitual interference with visitation. *See, e.g., Blotske v. Leidholm, supra.* In none of those cases did we deal with, nor have we ever been presented with, the custodial parent literally teaching the children in his charge to hate and disrespect their noncustodial parent. It seems too obvious to mention that that kind of conduct is absolutely unacceptable and should and would result in the termination of custody, because it is so contrary to children's best interests to learn from their parents hatred, intolerance and prejudice for the other parent. And, children are taught to hate. "Children learn hatred. They are infected by its virus early—learning it even from their mothers and fathers...." Quoted from an invitation, issued by New York Governor Mario Cuomo and Eli Weisel, to a conference at N.Y.U. Law School: The Anatomy of Hate: Saving Our Children. "Hate knows no frontiers, neither racial nor ethnic. Wearing various masks, it can be found among all religious and social communities." Speech by Eli Weisel at N.Y.U. Law School conference.

If I had been the factfinder, I may have found that Jon's prejudice against homosexuality led him to sabotage the children's love and affection for their mother, who happens to be a lesbian, and thereby caused irreparable harm. But the evidence, as is usually the case, is conflicting, contested and divergent. It supports two widely different stories. Precluded from substituting my judgment, I am not firmly and definitely convinced that the story told by Jon and accepted by the trial judge is a mistake. Therefore, I join in the affirmance of the order denying change of custody.

I agree with the majority that the restricted visitation, originally ordered by the trial judge, was wrong—but now corrected. In matters of custody, including visitation, I would hold that a parent's sexual orientation is never contrary to the best interests of a child unless there is established a causal connection between specific harm to the child and the parent's conduct. *See, e.g., Human Services Dept. v. Jacinta M.,* 107 N.M. 769, 764 P.2d 1327 (App.1988); *In*

*re Birdsall,* 197 Cal.App.3d 1024, 243 Cal. Rptr. 287 (1988); *Conkel v. Conkel,* 31 Ohio App.3d 169, 509 N.E.2d 983 (1987); *Stroman v. Williams,* 291 S.C. 376, 353 S.E.2d 704 (1987); *In re Cabalquinto,* 43 Wash.App. 518, 718 P.2d 7 (1986); *M.A.B. v. R.B.,* 134 Misc.2d 317, 510 N.Y.S.2d 960 (Sup.Ct.1986); *S.N.E. v. R.L.B.,* 699 P.2d 875 (Alaska 1985); *Guinan v. Guinan,* 102 A.D.2d 963, 477 N.Y.S.2d 830 (Ct.App. 1984); *Doe v. Doe,* 16 Mass.App. 499, 452 N.E.2d 293 (1983); *In re Cabalquinto,* 100 Wash.2d 325, 669 P.2d 886 (1983); *D.H. v. J.H.,* 418 N.E.2d 286 (Ind.Ct.App.1981); *Bezio v. Patenaude,* 381 Mass. 563, 410 N.E.2d 1207 (1980); *M.P. v. S.P.,* 169 N.J.Super. 425, 404 A.2d 1256 (1979); *Nadler v. Superior Court,* 255 Cal.App.2d 523, 63 Cal.Rptr. 352 (1967). Generally, there are no particular developmental or emotional problems for children raised by gay or lesbian parents. Dr. Michael E. Lamb, Chief, Section on Social and Emotional Development, National Institute of Child Health and Human Development, quoted in Daniel Goleman, *Gay Kids Not Psychologically Disadvantaged, Studies Say,* Miami Herald, Jan. 1, 1993. .

The majority correctly embraces the harm-to-the-child criterion for visitation, but our precedent is contrary to that principle in original custody proceedings. *Jacobson v. Jacobson,* 314 N.W.2d 78 (N.D.1981). I vigorously disagree with the principle of *Jacobson* that in an original custody proceeding, when two parents are supposedly equally fit and caring, that the tie-breaker should be sexual orientation. In my view, sexual orientation should never be a factor unless it is established that the sexual behavior of the parent causes specific harm to the children. And my position is well known that in a contested divorce case where the parents are equally fit to have custody, the one who has done the nursing, the chauffeuring, the tending, the disciplining, the nurturing, *i.e.,* the primary caretaker, should prevail, but that, of course, is another story. *See Gravning v. Gravning, supra* (Levine, J., dissenting). I would overrule *Jacobson* once and for all.

There is no-one who would disagree that our courtrooms should be safe havens from the glut of prejudice that festers in the outside world. Accordingly, homophobia has no place in our system or in our jurisprudence. While Dianne accuses the trial court of rank prejudice against her homosexuality, there is a contrary and benign explanation, supported by the evidence, for the trial court's denial of change of custody. Accordingly, I concur.