**Jeanine M. VON BANK, Plaintiff and Appellant,**

**v.**

**Jan VON BANK, Defendant and Appellee.**

Civ. No. 890053.

Supreme Court of North Dakota.

July 17, 1989.

Lanier, Knox & Olson, Fargo, for plaintiff and appellant, argued by Kathleen M. Ziegelmann, Fargo.

Kuchera, Stenehjem & Wills, Grand Forks, for defendant and appellee, argued by Karen Wills, Grand Forks.

MESCHKE, Justice.

The trial court transferred custody of Vanessa, age 5, to her father, Jan Von Bank, from her mother, Jeanine M. Von Bank. Jeanine appealed. We affirm.

Jan and Jeanine were married in 1980. Vanessa was born January 5, 1983. Jan and Jeanine separated in 1983 and divorced in 1984. The divorce decree placed Vanessa with her mother. The divorce was bitter and Jeanine resisted Jan's visits with Vanessa. Finally, in 1987, an amended decree set a schedule for Jan to have Vanessa on alternate weekends, on alternate holidays, and for part of each summer. The amended decree also directed that Jan have open access to Vanessa's medical and school records.

During the separation, Jeanine and Vanessa lived with Jeanine's parents on a farm near Buffalo, North Dakota. After the divorce, Jeanine and Vanessa lived in an apartment in Fargo. In the spring of 1988, Jeanine became engaged to a farmer living near Lake Park, Minnesota, about 40 miles from Fargo. Their marriage was planned for May 1989, when Jeanine planned to move to the farm to live with her new husband.

Jan married Brenda, who had two children, now ages 11 and 17. Jan and his new family lived nearby in West Fargo.

In May, 1988, Jan moved to obtain custody of Vanessa. Jeanine countered with a motion for increased child support. After affidavits, extensive depositions, and an evidentiary hearing, the trial court concluded

that there had been a significant change of circumstances and that it was in Vanessa's best interests for Jan to have her principal care, custody and control, subject to visitation with Jeanine. The trial court directed that Jeanine pay no child support.

On appeal, Jeanine argued that there was insufficient evidence of a significant change of circumstances to authorize redetermination of custody. Jeanine also argued that the trial court had not sufficiently weighed Jeanine's role as primary caretaker of Vanessa in assessing the best interests of the child.

■ Without centering on a single event, the trial court reviewed a cluster of circumstances occurring after Jan sought the amended decree for visitation in determining that there were significant changes authorizing reassessment of custodial placement. "Changed circumstances" are new facts which were unknown at the time of the prior custodial decree. *Wright v. Wright*, 431 N.W.2d 301 (N.D.1988). The trial court studied changes in Vanessa's "home environment and physical care," Jeanine's attempts to frustrate any on-going relationship between Jan and Vanessa, and expert testimony that "Vanessa shows signs of social isolation and depression."

Changes in Vanessa's home environment and physical care affected her well-being. The trial court determined that "Vanessa has stated to Jan and Dr. Deitz, [a licensed clinical psychologist], that [Jeanine's fiancee] also stays in their bedroom sometimes" where Vanessa slept in a bed separate from her mother. The trial court recognized, "[a]s to Vanessa's general health, individually the problems Jan complains about do not appear to be extraordinary." However, the trial court went on to find that "when looked at as a whole they are cause for concern." Vanessa had a series of ear and throat infections. These improved after Jan arranged a tonsillectomy for Vanessa. The trial court summarized an "abscessed tooth, tooth aches, [and an] unusual amount of tooth decay" stemming from a vulnerable condition of Vanessa's teeth, amid evidence that Jeanine was careless about carrying out a dentist's instruc-

tions for Vanessa to avoid sweets, to brush, and to floss her teeth. The trial court recounted a vaginal yeast infection "which required a trip to the emergency room" for Vanessa, initiated by Jan, where it was discovered that Jeanine "had been aware of this condition for a month or two." The trial court determined: "While many of [this "array of health and dental problems"] may be considered 'normal,' Jeanine appears to let the condition go until Vanessa is in severe pain, even though Jeanine is in the health care field herself." Though Jeanine disputed that she was indifferent to Vanessa's health and home environment, evidence supported the trial court's findings that the home environment and care furnished by Jeanine affected Vanessa's well-being.

The trial court granted that Jeanine's past attempts to frustrate Jan's visitation did "not appear to be a problem in the present." However, the trial court was plainly worried about Jeanine's conduct adversely affecting Jan's parental relationship with his daughter. The trial court determined that Jan was "not being informed about Vanessa's medical and dental health, [that] Jan [was] not being listed on school records as Vanessa's father," and that others than Jan were being listed in Vanessa's records for emergency notice. The trial court concluded that "Jeanine has attempted to frustrate the parent-child relationship between Jan and Vanessa." Also, the insistence of Jeanine's fiancee that he did not want Jan to come to his farm to pick up Vanessa for visitation so that "Jeanine will have to meet Jan half way to drop off Vanessa with [Jan] for visitation" was deemed adverse. The trial court ruled "that this arrangement would not be in the best interests of Vanessa." We conclude that evidence supported the trial court's findings that Jeanine sought to frustrate Jan's parental relationship with Vanessa to an extent that adversely affected Vanessa.

The trial court was most concerned that, according to Dr. Deitz who testified for Jan, "Vanessa shows signs of social isolation and depression." Jeanine offered no

countervailing expert testimony. The trial court combined this finding with a concern about the effect on Vanessa of the potential move to an isolated rural Minnesota area. In light of Dr. Deitz's testimony, the trial judge was worried that "a move to a farm with no other children, a smaller community, and new surroundings could also cause problems for Vanessa." Troubled that "Jeanine chose not to participate in the evaluation by Dr. Deitz, nor did she utilize the Employee Assistance Program [for psychological testing and counseling] made available to her through her employer, Dakota Hospital," the trial court weighed Vanessa's social isolation and depression significantly.

Whether changes in circumstances authorize a redetermination of placement of a child's custody is a question of fact. *Miller v. Miller*, 305 N.W.2d 666 (N.D.1981); *Lapp v. Lapp*, 336 N.W.2d 350 (N.D.1983); *Pitsenbarger v. Pitsenbarger*, 382 N.W.2d 662 (N.D.1986). The changes must not only be significant, but they must also indicate that a change in custody will promote the child's best interests. *Orke v. Olson*, 411 N.W.2d 97 (N.D.1987). Under NDRCivP 52(a), we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Since there was supporting evidence, we conclude that the changes found by the trial court sufficiently affected the well-being of Vanessa to merit reevaluation of her custody.

Citing Professor O'Kelly as authority, Jeanine argued on appeal that this court "should protect children and their vital relationship with their primary caretaker and adopt the primary caretaker rule." If we did, Jeanine contended that we would reverse the trial court's decision to remove Vanessa from the uninterrupted continuity of custody by her mother.

Marcia O'Kelly, Professor of Law at the University of North Dakota, has ably advanced adoption of a "weak" preference in favor of the primary caretaking parent in custodial placements. O'Kelly, *Blessing The Tie That Binds: Preferring The Primary Caretaker As Custodian*, 63 N.D.L. Rev. 482 (1987). Professor O'Kelly reasons that a preference for the primary caretaker "reduces the risk of undervaluation of the intimate interaction and vital psychological bonding between children and their primary caretakers and therefore more effectively protects continuity of care for children." O'Kelly, *supra*, at 485.

"Comparative evaluation of two fit parents, with no greater weight or preference assigned to a particular factor, confers virtually unchalleng[e]able discretion on a trial court because the court need show only that one of numerous available considerations supports a particular decision. A best interest standard that treats all relevant considerations as of equal weight and importance is essentially indeterminate. In the absence of any ranking of qualities relevant to evaluating parenting, there is no objective basis for choosing between fit parents with different strengths and weaknesses." O'Kelly, *supra*, at 500.

We have recognized the importance of "persons who provide a child's daily care and who, thereby, develop a close personal relationship with the child [as] the psychological parent to whom the child turns for love, guidance, and security." *Patzer v. Glaser*, 396 N.W.2d 740, 743 (N.D.1986). But, we have not yet accorded the primary caretaker factor any elevated status as a presumptive rule, although one member of our court has urged it. *Gravning v. Gravning*, 389 N.W.2d 621 (N.D.1986) (Justice Levine, dissenting). While the primary caretaker role inheres in the statutory factors to be considered in every case, we decline to give presumptive weight to that single factor in this case.

Some courts utilize a "strong" primary caretaker presumption, rebuttable only if the primary caretaker is unfit, in initial custody placements between divorcing parents. *Pikula v. Pikula*, 374 N.W.2d 705 (Minn.1985); *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981). But these courts do not apply the primary caretaker presumption when a transfer of custody is sought. *Sefkow v. Sefkow*, 427 N.W.2d 203, 213 (Minn.1988); *Legg v. Legg*, 169 W.Va. 753, 289 S.E.2d 504 (1982). Even if

we were to postulate some kind of preference for the primary caretaker of a child in initial placements, it is improbable that we would apply it to modifications of an existing custodial placement. *Compare* Professor O'Kelly's observations about the relevancy of the time frame for identification of the primary caretaker. O'Kelly, *supra,* at 541. Considerations of finality already guard against modification of a prior custodial decree "without a showing of a significant need for doing so." *Wright v. Wright,* 431 N.W.2d 301, 303 (N.D.1988). Adding another legal presumption for the custodial parent would overbalance the scales too far.

Jeanine argued alternatively that the trial court did not give sufficient consideration to the fact that she had been Vanessa's primary caretaker since birth.

In addition to assessing related facts that entered into the inquiry about the significance of changes for redetermination of custody, the trial court painstakingly assessed each of the factors "affecting the best interests and welfare of the child" set out in NDCC 14–09–06.2. Measuring which was the closest, nurturing parent, the trial court found that Jeanine's primary role was already reduced:

> "Vanessa's psychological parent, or the person who provides daily care, guidance, and security for the child, appears to the Court to be many people. Jeanine provides daily care; however, Vanessa eats breakfast at the day-care, Vanessa does all her own personal grooming, and on the weekends that Jeanine has Vanessa, Vanessa frequently stays at Jeanine's parents' house without Jeanine."

The trial court determined that Jan appeared better able to monitor and meet Vanessa's educational and health needs. It was Jan who suggested Vanessa be placed in a preschool setting, who arranged for her preschool screening, and who took Vanessa to swimming lessons, as well as arranged for many of her medical appointments. The trial court saw emotional attachment between Jan and Vanessa, remarking on testimony "that there existed a good, solid father-daughter relationship"

between them. Recognizing that Vanessa's current custodial home would soon change and that her continuity was likely to be upset by Jeanine's planned remarriage and move, the trial court concluded that the better and more caring environment for Vanessa was with Jan.

We believe that the trial court fairly considered relevant factors, including appropriate consideration of the role of each of Vanessa's parents in her caretaking. Sufficient evidence supported the trial court's findings. Therefore, we affirm the trial court's order transferring primary custody of Vanessa to her father.

ERICKSTAD, C.J., and GIERKE and VANDE WALLE, JJ., concur.

B. LEVINE, J., concurs in the result.