Joli F. JOHNSON, Plaintiff and Appellee,

v.

Terry W. JOHNSON, Defendant and Appellant.

Civ. No. 910108.

Supreme Court of North Dakota.

Jan. 9, 1992.

Ella Van Berkom Law Firm, Minot, for plaintiff and appellee; argued by Ella Van Berkom, Minot.

David W. Nelson (argued), Williston, for defendant and appellant.

ERICKSTAD, Chief Justice.

Terry Johnson appeals from a Supplemental Judgment of the district court denying his motion to change custody of the parties' minor children, Jeremiah and Jacob, from their mother, Joli Johnson, to Terry. Because the district court's finding that there has not been a significant change of circumstances since the original

custody decree warranting a change of custody is not clearly erroneous, we affirm.

After a six-year marriage, Terry and Joli were divorced in December 1988. The parties stipulated that other matters such as property division, child custody, and spousal support would be determined at a later date. On May 16, 1990, the district court entered a decree, awarding Joli custody and settling the other unresolved divorce-related issues, based upon a stipulated agreement between Terry and Joli.

Between the entry of the divorce decree in December 1988 and the original custody decree in May 1990, there was a thorough and on-going investigation of allegations made by Jeremiah that his father, Terry, had sexually abused him. Jeremiah had graphically described instances of abuse which implicated satanic cult practices by his father and unrelated persons while the family was living in the mountains of Northern Idaho. Although the experts involved in the investigation, including psychologists and social workers, were perplexed about the origin of these allegations by Jeremiah, who was only four years old when he first made them, they were unable to substantiate that Jeremiah had ever been abused by Terry or others.

On August 7, 1990, Joli filed a motion requesting permission to move to Minnesota with the boys. Terry resisted the motion, and on August 21, 1990, filed a motion for a change of custody. The district court held a hearing on December 19, 1990, to consider both motions. During the proceedings, Joli withdrew her motion for permission to leave North Dakota. At the conclusion of the hearing, the district court denied Terry's motion for a change of custody, and Terry then filed this appeal.

■ An original custody award revolves solely around a determination of what is in the best interests of the child. *Miller v. Miller,* 305 N.W.2d 666 (N.D. 1981). However, a request to modify an original custody award requires a determination by the court of two issues in chronological order: (1) whether there has been a significant change of circumstances since the original custody award; and, if so, (2) whether the significant change of circumstances requires, in the best interests of the child, that the court change custody. *Wright v. Wright,* 431 N.W.2d 301 (N.D. 1988). The burden is on the party seeking modification to demonstrate that there has been a significant change of circumstances which requires a change in custody. *Lapp v. Lapp,* 336 N.W.2d 350 (N.D.1983). The trial court's determination on a motion to modify an original custody award is subject on appeal to the clearly erroneous standard of review under Rule 52(a), N.D.R.Civ.P. Therefore, the trial court's findings will not be set aside unless they are clearly erroneous. *Ebertz v. Ebertz,* 338 N.W.2d 651 (N.D.1983).

In denying the motion for a change of custody, the trial court found that there had been no significant change of circumstances since the May 1990 custody award that "indicate[s] that the best interests of the children would be served by a change in custody." The trial court also made specific findings that since the original custody award Joli and the boys have moved into a home apart from her parents with whom they had been living at the time the original decree was entered, that the structured visitations with Terry "have been working smoothly" and that the school-aged boy, Jeremiah, "is doing very well in school."

On appeal, Terry asserts that the trial court erred in finding that there was not a significant change of circumstances to warrant a custody change. More specifically, Terry asserts that Joli continues to believe Jeremiah's allegations that, while living in Idaho, Terry abused him in satanic rituals and that because of Joli's anger and distrust of Terry she attempts to sabotage Terry's relationship with the boys.

Prior to the December 19, 1990, hearing, Terry, Joli, and the two boys were reevaluated by three psychologists: Dr. Barney Greenspan, Dr. Jim Wahlberg, and Dr. James Brandt. Dr. Brandt and Dr. Wahlberg concluded from their evaluations that Jeremiah and Jacob should remain in Joli's custody. Terry primarily relies upon Dr.

Greenspan's report and testimony to support his request for a change of custody.

Dr. Greenspan is the Chief of Psychological Services at the North Central Human Service Center in Minot. Dr. Greenspan evaluated this family prior to the original custody award. At that time he concluded that Jeremiah has "an enormous loyalty conflict" toward his parents. He concluded that the relationship between Terry and Jeremiah has been "deliberately and systematically sabotaged" by Joli. Nevertheless, Dr. Greenspan made a reserved recommendation that it was in the best interests of Jeremiah to continue to live with Joli, contingent, however, upon her supporting Terry and Jeremiah's relationship.

In his subsequent evaluation of the parties, after Terry had moved the court for a change of custody, Dr. Greenspan observed that "the central issue in this ongoing struggle is Jeremiah's conflicts regarding parental loyalty." He stated that while Jeremiah is living with Joli "he feels compelled to degrade and blame" Terry. Dr. Greenspan stated that he did not suspect Joli was consciously directing Jeremiah in that direction, but that "the damage has already been done." After concluding that it would be appropriate to change custody of the boys to Terry, Dr. Greenspan offered some of these final thoughts:

"Jeremiah is a youngster at risk, psychologically speaking. I believe his mother has truly interfered with his healthy development of a working conscience. I worry about his future ability to distinguish reality from fantasy, the ways in which his anger could manifest itself, and how his guilt feelings will interfere with his emotional growth and development. . . .

"Jeremiah will do fine living with his father, although he will undoubtedly tell mother the opposite to please her. If Mr. Terry Johnson is denied custody at this juncture, Jeremiah will learn that deceit, deception, and neurosis rule the day. As long as Ms. Joli Johnson is convinced of her previous allegations about Mr. Johnson, she will attempt to do whatever she can to interfere with the father/sons relationship. . . ."

While testifying at the motion hearing, Dr. Greenspan was asked what his recommendation would be now about Jeremiah and Jacob's custody. He responded,

"Well, considering there has to be a recommendation one way or the other, I recommend that custody go with the father and the reason that I say that is that I don't feel Mrs. Johnson has given enough due credence to the father-child relationship to be able to support that and defend that and protect that. . . ."

He was also asked what he had observed as to the relationship between Jeremiah and Joli. He responded that they had a "caring, loving, kind, meaningful relationship." Later in his testimony, Dr. Greenspan stated that he had no doubt that Joli gives the boys good care and is a good mother. Dr. Greenspan testified that he was bothered by Joli's "delusional" belief that Terry had been involved in some type of satanic cult activity in Idaho and had, at that time, abused Jeremiah. However, Dr. Greenspan testified that Joli's unfounded belief in this specific matter does not extend to other areas and "doesn't interfere ostensibly with other aspects of her functioning."

Dr. Wahlberg holds a doctorate degree in social work as well as a bachelor's degree in psychology and sociology. He is a professor at Minot State University and also does consultant work in his field. Dr. Wahlberg also reevaluated the family. He concluded that custody should remain with Joli. He recommended that both Terry and Joli be encouraged to refrain from using the children to get at their own unresolved personal problems. Dr. Wahlberg described Jeremiah as a delightful and energetic boy who is well-mannered, well-behaved, and very likeable. He concluded that Jeremiah's allegations of past happenings could neither be substantiated nor denied. However, he believed that the counseling Terry, Joli, and Jeremiah were receiving would help them deal with unresolved issues from the divorce.

Dr. James Brandt is a professor of psychology and Director of the Student Coun-

seling Center at Minot State University. He is a staff psychologist at St. Joseph's Hospital and the Medical Arts Clinic, and he is also a consultant with Trinity Hospital in Minot. He also reevaluated Terry, Joli, and the boys. Dr. Brandt concluded that "all parties want what is best for the children," and that both parents would provide a good home for them. Dr. Brandt testified that Joli is well capable of caring for the children and has very strong bonding with them. He stated that although Joli continues to believe that Terry abused Jeremiah in the past, there is "nothing wrong with her thinking in all other areas." Dr. Brandt testified that it is possible that some abuse of Jeremiah did occur but that "[i]t's just very hard for me to believe that much has happened to him." Dr. Brandt indicated that Joli's persistent belief that Terry had abused Jeremiah was perpetuated by professionals who had examined Jeremiah in Minneapolis and Seattle and "threw up red flags." Dr. Brandt stated that a parent faced with this situation would certainly investigate every possibility surrounding the child's allegations out of concern for the child. Dr. Brandt concluded that it would be in the boys' best interests to remain with Joli.

In addition to the psychologists' reports and testimony, the trial court had other evidence to consider, including a letter to the court from the boys' guardian ad litem and the testimony of both parents.

In a letter, Gerald Rustad, the boys' guardian ad litem, told the court that both parents have love and affection for the children and that both of them could provide a completely adequate home for the boys. He noted that Jeremiah is doing very well in school and that both boys' clear preference is to live with Joli. Rustad told the court that he did not spend considerable time worrying about the "change of circumstances" standard that the court must utilize, but that he would recommend, in the best interests of the children, that they reside with Terry, subject to very liberal visitation with Joli.

Terry testified at the hearing that he has obtained a job as a soil conservationist at

Forsyth, Montana, where he and his present wife, Sissy, reside with her two teenage boys. Terry agreed that Jeremiah is "progressing well in school," and getting A's on his report card. Terry concedes that since the original custody award visitations have "gone good" and that although picking the boys up was at first a problem "lately, it has been getting better." Terry testified that during the early visitations Jeremiah was real bad about telling lies, but that now "he doesn't do that too much anymore." He also testified that he has been able to reestablish a very good relationship with the boys. Terry also testified that the boys are excited about moving into a new trailer house with their mother. When asked during cross-examination if the urgency of his motion for a change of custody had changed when Joli withdrew her motion to leave North Dakota, he responded, "[y]eah, the urgency has—of it has definitely changed; yes."

Joli also testified at the hearing. Regarding Jeremiah's allegations of abuse Joli testified, "I really want it to be over." She testified that she does not encourage Jeremiah to talk about the past, and that she especially refrains from discussing with him the subject of abuse. She also testified that she has no objection to Terry seeing the children, and that she does the best she can to see that the boys' visitations with Terry proceed smoothly, without trauma.

The trial court concluded that in the few months between the time when Joli was awarded custody of the boys and when the court was asked to change custody there had not been a significant change of circumstances. Although there was conflicting testimony by the experts on factors relevant to this issue, there was substantial evidence upon which the trial court could reach the conclusion that it did.

This court limits its scope of review, recognizing the trial judge's ability to ascertain the demeanor and credibility of witnesses. *Ebertz v. Ebertz*, 338 N.W.2d 651 (N.D.1983). Although the trial court cannot arbitrarily disregard expert testimony, the court, as the trier of fact, can

assign the weight to be given to an expert's testimony, and the court is not required to accept an expert's opinion as being conclusive. *Gardebring v. Rizzo,* 269 N.W.2d 104 (N.D.1978); see also *Cross v. Cross,* 374 N.W.2d 346 (N.D.1985). The court obviously gave greater weight to the expert conclusions of Dr. Wahlberg and Dr. Brandt than it gave to the opinion of Dr. Greenspan. However, it is not apparent that the trial court arbitrarily disregarded any of the relevant evidence.

Every expert was in agreement that Joli is a fit mother who has provided good care for the boys and has bonded very well with them. There was no evidence to the contrary.

Dr. Greenspan concluded that Joli should no longer have custody of either boy because she continues to harbor beliefs that Jeremiah was probably abused by Terry in the past. Dr. Brandt and Dr. Wahlberg disagreed. They recognized that Joli is not without reasons for persisting in her belief. Ultimately, Dr. Brandt concluded that there had been very little, if any, actual abuse of Jeremiah in the past. However, Dr. Wahlberg was less certain of what occurred, and he indicated that perhaps no one will ever really know.

One could reasonably conclude from Terry and Joli's testimony that Joli has not sabotaged Terry's relationship with the boys, but instead, has allowed that relationship to grow and to improve. Terry even testified that, during the period following the original custody award, he has been able to establish a good relationship with the boys and that visitations have continued to improve and are now going smoothly.

In addition, the court undoubtedly took into consideration that both boys have lived their entire lives with Joli, that they have strong bonds with her, and that they have developed quite well in most aspects of their lives. With regard to Jeremiah's apparent tendency to lie and to confuse reality with fantasy, the court obviously gave consideration to Joli's continued efforts to get counseling for herself and for Jeremi-

ah, and to the fact that Jeremiah is improving.

■ The trial court should order a change of custody only for a compelling reason, not upon a finding that some marginal improvement in a child's life may occur. *Orke v. Olson,* 411 N.W.2d 97 (N.D. 1987). Furthermore, a trial court should be more reluctant to modify a decree that is based upon a stipulation of the parties rather than upon findings made by the court. See *Wheeler v. Wheeler,* 419 N.W.2d 923 (N.D.1988). With these principles in mind, and having reviewed the entire record, we are not convinced that the trial court made a mistake. There is substantial evidence to support the trial court's finding that there has not been a significant change of circumstances since the original custody award that warrants a change of custody at this time.

In accordance with this opinion, the Supplemental Judgment of the district court, denying Terry's motion for a change of custody, is affirmed.

LEVINE, J., concurs.

Justice H.F. GIERKE III, a member of the Court when this case was heard, resigned effective November 20, 1991, to accept appointment to the United States Court of Military Appeals and did not participate in this decision.

VANDE WALLE, Justice, concurring specially.

I concur in the result reached by the majority but I do not join the majority opinion for I believe it blurs the two-step analysis we have heretofore espoused as the necessary procedure in considering a request to modify a custody award. For example, in *Miller v. Miller,* 305 N.W.2d 666 (N.D.1981), we stated that a request to modify a custody award requires the determination of two issues: the threshold issue of whether or not there has been a significant change of circumstances since the original divorce decree and custody award; and, only if the court has determined there has been such change, whether or not those changed circumstances are such that

the best interests of the child would be served by a change in custody. That has been a constant requirement through all our decisions on changes in custody.

This case was presented to us by the appellant on the basis that the trial court did not reach the issue of the best interests of the children because it found there was not a significant change of circumstances. There are also indications in the record that the trial court, if it had determined there had been a change of circumstances, would have found that the best interests of the children would be served by a change in custody. Although we are not obliged to accept appellant's explication of the trial court's decision, that issue is not clearly addressed in the majority opinion; rather, the majority opinion concludes there is substantial evidence "to support the trial court's finding that there has not been a significant change of circumstances since the original custody award that warrants a change of custody at this time." I agree that the change in circumstances must be a change that affects the children's best interests, but I am not convinced that was the finding of the trial court. There is little or nothing in the trial court's findings to indicate that it reached the issue of the best interests of the children although there is, as the majority opinion discusses, substantial evidence in the record on that issue.

My concern is that a blurring of the two-step process, which we have heretofore required, will result in only token adherence to the analysis and that the threshold issue of whether or not there is a change in circumstances will be subsumed by the issue of the best interests of the children which will, in turn, determine whether or not a change of circumstances has occurred in the first instance. This would turn the · analysis on its head and in every instance the court will determine whether or not the best interests of the children are served by a change of custody. If that is found to be the result in a given case we can assume the court will find a change in circumstances to justify the change. Cynics might believe that is now the process and others may believe that a motion for a change in custody should be driven by the

best interests of the children without concern to whether or not there has been a change in circumstances. There are substantial reasons for the requirement that a change in circumstances exist before a consideration of the best interests of the children are considered, not the least of which is a brake on the number of motions to change custody.

I concur in the result because I am not convinced there was a change of circumstances that justified the trial court in reaching the second prong of the analysis, i.e., the children's best interests. *If* we are to reach the second prong, although I do not believe the trial court did so, I do not believe the evidence is sufficient to indicate that the children's best interests would necessarily be served by a change in custody.

MESCHKE, Justice, dissenting.

Because the trial court believed that there was no evidentiary basis to find sufficient circumstances for a change of custody, while believing that "perhaps the best interests of the boys might be with their father," I would reverse and remand for reconsideration. There is evidence that, if credited, would authorize the trial court to find a significant change in order to reevaluate custody.

The trial court felt constrained to conclude that the circumstances had not changed since the divorce:

> Two of the psychologists recommended that custody remain with the Plaintiff, Joli, and one of the psychologists and the Guardian Ad Litem recommended that custody be changed to Terry, the father. All of their opinions/recommendations are based on primarily the best interests of the children and the Court concurs that perhaps the best interests of the boys might be with their father, but the Court also realizes, by our guidelines set down by the Supreme Court, that it must first find significant change of circumstances before it can change custody of the children.

\*    \*    \*    \*    \*    \*

For the purposes of finality, a prior decree should not be modified without a showing of a significant need for doing so.

The trial court then discussed, at some length, prior decisions about what is a significant change of circumstances and, only then, concluded that Terry had "failed to sustain the burden of proof." This tells me that the court thought that the evidence did not permit a finding that a significant change existed to justify reevaluation of the best interests of the children.

Dr. Greenspan was the court-appointed psychologist. After his initial evaluation of both parents and the children, Dr. Greenspan "reservedly" recommended that "[c]ustody remain with ... Joli ... at least for the time being." He explained his reservation:

> I believe Jeremiah [h]as been systematically set-up, used, and programmed by his mother to act-out her angry feelings toward Mr. Johnson. Jeremiah has been dealt with in such a way by his mother that I am concerned about his mental health, growth, and emotional development. She is teaching him to lie, be deceitful, and dishonest, which is a gross interference with conscience formation which could conceivably lead to characterological personality traits and behaviors, such as criminality. The relationship between son and father (which I observed to be meaningful to Jeremiah) has been deliberately and systematically sabatoged [sic] by Jeremiah's mother, Ms. Joli Johnson.

Dr. Greenspan was apprehensive about the extent of psychological harm to Jeremiah from Joli's conduct while caring for Jeremiah. Soon after this tentative recommendation by Dr. Greenspan, in May 1990, Terry stipulated that Joli continue with primary custody of the children.

After Terry moved to change custody, Joli retained James Wahlberg, a licensed and certified social worker, who recommended that custody remain with Joli and that her move to Minnesota be permitted, but that the parents and Jeremiah should each receive counseling "to deal with any unresolved issues stemming from the divorce." This evidences guarded concern over Jeremiah's psychological health.

Joli also retained Dr. Brandt, who was even more guarded about Jeremiah's emotional health in Joli's care. Dr. Brandt diagnosed Joli with a "[p]ossible delusional (persecutory type) disorder," and recommended that she "should engage in some counseling," although "Joli will not see this as relevant since she feels that all the difficulties are on her husband's side." Dr. Brandt recommended that "Jeremiah engage in some long-term therapy" because "[t]he situation has placed Jeremiah in a difficult position, with which he needs help." Dr. Brandt stressed that "Jeremiah needs the opportunity to be a normal young man without having to worry about the difficulties that are occurring between his parents." Dr. Brandt suggested that "long-term therapy should be considered" for the smaller child, Jacob, as well. Thus, Dr. Brandt, too, was uneasy with the psychological health of the children while in Joli's care. Still, Dr. Brandt suggested that custody remain with Joli because they "have spent more time with the mother."

Before the trial on change of custody, Dr. Greenspan updated his provisional report. He opined that Joli's "proposed move is intended to create a separation between father and children ...," declared that "[s]ignificant psychological harm would most likely develop in Jeremiah if he moved out of state with restricted visitation with his father," and recommended that "[i]t is appropriate and acceptable for the children to change custody to that of the father." Dr. Greenspan explained:

> Jeremiah is a youngster at risk, psychologically speaking. I believe his mother has truly interfered with his healthy development of a working conscience. I worry about his future ability to distinguish reality from fantasy, the ways in which his anger could manifest itself, and how his guilt feelings will interfere with his emotional growth and development, e.g., interferences in concentration and learning; unconsciously setting him-

self up to get punished, restricted, or controlled by others.

Jeremiah will do fine living with his father, although he will undoubtedly tell mother the opposite to please her. If Mr. Terry Johnson is denied custody at this juncture, Jeremiah will learn that deceit, deception, and neurosis rule the day. As long as Ms. Joli Johnson is convinced of her previous allegations about Mr. Johnson, she will attempt to do whatever she can to interfere with the father/sons relationship. Hopefully, ongoing individual psychotherapy will be of benefit. Also, Jeremiah needs treatment on a regular basis to understand, and subsequently deal with, his neurotic conflicts around guilt, aggression, untruthfulness, and his feelings about both parents.

Dr. Greenspan testified that Joli's "paranoid, pathological, disturbed thinking and feeling pattern" has "sabotaged the relationship between father and son." According to Greenspan, "Mrs. Johnson has been unfit in her role of how she has dealt with the boy's father in relation to the boy which has caused him, I think, difficulties in his subsequent emotional development."

If the trial court credits Dr. Greenspan's conclusions, the continuing psychological harm to Jeremiah is a serious change. *Wenzel v. Wenzel,* 469 N.W.2d 156, 157 (N.D.1991) ("The serious relationship which has developed between [the custodial parent] and a man her child understandably fears [whom the child heard severely beat his mother] is a significant change of circumstance."); *Wright v. Wright,* 463 N.W.2d 654, 656 (N.D.1990) ("The trial court erroneously determined that [the custodial parent's] ... inappropriate physical discipline, improper care, and inadequate supervision of [children] did not constitute a significant change of circumstances.") Harm to a child while in the care of one parent is a significant change of circumstances that authorizes a trial court to re-evaluate the best interests of the child.

Emotional or psychological harm, no less than physical harm, resulting from a parent's conduct justifies consideration anew of the best interests of the child. *Von Bank v. Von Bank,* 443 N.W.2d 618, 620 (N.D.1989) ("[T]he changes found by the trial court [including child's 'social isolation and depression'] sufficiently affected the well-being of [the child] to merit reevaluation of her custody.") *See also,* Unif. Marriage and Divorce Act § 409, 9A U.L.A. 628 (1987) (In applying standards for modification of a custody decree, "the court shall retain the custodian appointed pursuant to the prior decree unless: ... (3) the child's present environment endangers seriously his physical, mental, moral, or emotional health, and the harm likely to be caused by a change of environment is outweighed by its advantages to" the child.) *Compare Pitsenbarger v. Pitsenbarger,* 382 N.W.2d 662 (N.D.1986). Because the trial court mistakenly felt constrained in its view of the evidence here, I would reverse and remand for reconsideration of the sufficiency of the evidence to merit implementation of the trial court's conclusion about the best interests of the children.

For these reasons, I respectfully dissent.