Catherine M. BARSTAD, Plaintiff and Appellant,

v.

James R. BARSTAD, Defendant and Appellee.

Civ. No. 920278.

Supreme Court of North Dakota.

April 27, 1993.

Charles A. Stock of Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for plaintiff and appellant.

Maureen Holman of Serkland, Lundberg, Erickson, Marcil & McLean, Ltd., Fargo, for defendant and appellee.

LEVINE, Justice.

Catherine Barstad (Cathy) appeals from an amended judgment changing custody of her son, Ryan, to Ryan's father, James Barstad (Jim). We reverse and remand.

At the time of Jim and Cathy's marriage in October 1982, Cathy's son, Ryan, was three years old. Jim adopted Ryan soon after their marriage. The couple's second son, Bradley, was born in March 1983. Jim and Cathy were divorced in November 1988. Cathy received custody of the two boys and Jim received supervised visitation because of the manifestations of his behavioral disorder of exhibitionism, a condition which was deemed treatable but not curable. At the time of the divorce, Jim had a record of four convictions for indecent exposure between 1981 and 1987, and for the years 1973 to 1985, three convictions of disorderly conduct, one conviction of lying-in-wait and one conviction of making an obscene or harassing telephone call. After the divorce, an additional incident occurred in 1988.

After receiving treatment, Jim petitioned for unsupervised visitation in February

1990, which the court ultimately granted. Jim has fully exercised his unsupervised, alternate weekend and extended summer visitation rights since then and has also visited with the boys, by agreement with Cathy, one evening a week. Apparently, Jim stopped receiving treatment in 1990.

In February 1992, Cathy told Jim of her engagement to Charles Koval and asked for Jim's consent to her moving with the children to Charles' residence in Crookston, Minnesota. At first, Jim consented to the move, but he later withdrew that consent and moved to gain the boys' custody. According to Jim, he sought custody for a variety of reasons, the foremost of which were the boys' statements, obtained in response to Jim's interrogation, that they preferred to live with him in Fargo. He also believed they would benefit from their continued involvement in the Fargo sports community and that he could help improve Ryan's poor academic performance. Jim was uneasy, as well, about how the boys would adapt to living with Charles' three children.[1]

Cathy subsequently filed a motion to change the boys' residence to Crookston, Minnesota. She claimed the move was in the boys' best interests, that her fiance, Charles, would have a positive influence on them, and that the short distance between Crookston and Fargo would not affect Jim's visitation rights. After a change in Cathy and Charles' plans, Cathy amended her motion to state her proposed residence as Shelly, Minnesota, a small community approximately 38 miles from Fargo.

With both motions filed and a hearing scheduled, Jim, Cathy, Ryan and Bradley, at Jim's request, underwent custody evaluations from psychologist Neil Clark. Dr. Clark prefaced his "Custody Evaluation Summary" with the following remarks:

"With regards to background (psychosocial history) Ms. Barstad presents a normal background, and Mr. Barstad has had several relevant problems: physical abuse as a child, inpatient and outpatient psychiatric treatments, and nine law enforcement convictions. None of his his-torical problems showed a direct impact on either of the children. They have not been victimized nor abused. Generally, in custody related issues a period of two-three years since the last occurrence is considered a remission of the situation. That period of time has been established for Mr. Barstad. This examiner would point out, however, that there have been previous periods of remission, followed by reoccurrence."

Apparently treating his custody evaluations for this modification proceeding no differently than he would for an original divorce proceeding, Dr. Clark concluded that Cathy and Jim were "suitable and competent parents" and that neither posed "any dangers to the children." In recommending Ryan's placement with Jim, Dr. Clark explained:

"Ryan's current personality adjustment is superior. He currently feels more closely attached to his father. He states a clear preference for living with his father. He wants to maintain his involvements in the Fargo community (friends, sports, schools). When asked if Ms. Barstad were to remain in Fargo, would his preference for living with his father change, he replied, 'no'. Ryan reported more mutual activities with his father."

Dr. Clark thus recommended, based on "the preference of the child, the extent of community roots, continuity of schools/sports/friends, the developmental age of the child, the mixed affect (conflicts) of the siblings, and the prospects of readjusting to a new blended family, new school, [and] new friends," that Jim receive custody of Ryan and Cathy retain custody of Bradley.

Cathy had the boys examined by another psychologist, Dr. Berch R. Offutt. Dr. Offutt made no recommendation regarding custodial placement and did not comment on Dr. Clark's custody evaluation. However, Dr. Offutt observed that Ryan, who was twelve years old at the time, was "under significant stress regarding his present family situation" and was "attempting to

---

1. Charles has four children from a prior mar-riage, three of whom are in his custody.

hang on to as much of the past as he can in order to provide himself with some stability, *e.g.*, not wanting to move from Fargo and keeping his relationship with his friend[s]." Dr. Offutt recommended that little weight be given to Ryan's stated preferences, cautioning that Ryan's stated preference should be "questioned thoroughly given his cognitive weaknesses and his emotional vulnerability."

A hearing on the parties' motions was conducted in June 1992. At the close of the proceeding, the court orally granted Cathy's motion to move, suggested that she would receive custody of Bradley, but retained the issue of Ryan's custody under advisement. Cathy married Charles on July 11, 1992. On August 10, 1992, the court issued its memorandum opinion, finding that there had been a significant change of circumstances and that it was "in the interests of the minor children" that Jim take custody of Ryan, that Cathy retain custody of Bradley, and that visitation be modified. The court's findings and conclusions of law were incorporated into its third amended judgment. Cathy has appealed from that judgment, challenging the change of Ryan's custody.

▇▇▇ A trial court's decision to modify custody is a finding of fact subject to the clearly erroneous standard of review. *Blotske v. Leidholm*, 487 N.W.2d 607 (N.D. 1992). A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.; see* N.D.R.Civ.P. 52(a).

▇▇ A request to modify custody requires the determination of two issues in chronological order: (a) whether there has been a significant change of circumstances since the original divorce decree and custody award; and, if so, (b) whether those changes compel or require, in the best interests of the child, a change of custody. *Delzer v. Winn*, 491 N.W.2d 741 (N.D. 1992).

▇▇ The court's memorandum opinion was issued on August 10, 1992, only shortly after this court's opinion in *Blotske v. Leidholm*, on July 28, 1992, and several months before we decided *Delzer v. Winn* on November 5, 1992. *Blotske* and *Delzer* capsulize the proposition that in a change of custody proceeding, the child's stability with the custodial parent is a primary consideration, and the statutory factors of NDCC § 14–09–06.2 must be weighed with that primacy in mind. The *Blotske–Delzer* duo also cautions that a trial court should change custody only if a change in custody is necessary or required for the best interests of the child. While those best interests are to be determined from considering the statutory factors in NDCC § 14–09–06.2, the process of weighing those factors must be "gauged against the backdrop of the stability of the child's relationship with the custodial parent." *Blotske, supra* at 610; *Delzer, supra* at 744. The maintenance of custodial stability and continuity "is a very compelling consideration." *Delzer, supra* at 744.

So the question becomes whether the trial court's assessment in this case comports with the rule of *Blotske* and *Delzer*. We believe it does not; therefore, we reverse the order transferring Ryan's custody to Jim.

The trial court, in effect, identified three significantly changed circumstances: Cathy's marriage and move to Shelly, Minnesota; the move's effect on the present visitation scheduling; and Ryan's "reasonable and knowledgeable preference to reside with Jim."

▇▇▇ As to the first significant change, Cathy's move and remarriage, we have said that a "move to another state does not, by itself, compel a change of custody. If the trial court approves the move, even after the fact, the move does not dictate a change of custody." *Gould v. Miller*, 488 N.W.2d 42, 44 (N.D.1992). Nor does remarriage dictate a change of custody. *Id.* We thus look to the other factors the trial court found were significant and required a change of custody.

■ The trial court found that the move to Shelly, 38 miles away, significantly affected visitation and presumably compelled a change in custody. In *Blotske*, the custodial parent not only moved and in that way affected visitation, but also deliberately frustrated the noncustodial parent's visitation rights. We concluded that the remedy for that frustration was not a change in custody but, rather, a specified visitation schedule which would, in effect, serve warning upon the recalcitrant custodial parent, while protecting the rights of the noncustodial party. Here, the trial court did not find any infringement of visitation and so it seems clear to us that a change of custody is not the answer to protecting Jim's visitation rights, if, indeed, they require protection. A 38–mile separation does not necessarily have to interfere with Jim's visitation of the boys. If, however, his extra-decree weekly midweek visitation is made impractical by the move, and the trial judge is concerned about that, then some additional visitation could be arranged to make up for the "informal" visitation formerly engaged in in Fargo. That would ensure his visitation rights while continuing the stability and nurture furnished by Cathy in her ongoing custody of the boys. *See, e.g., Thomas v. Thomas*, 446 N.W.2d 433 (N.D.1989).

■ We come to the effect of Ryan's preference to live with his father. The trial court found that twelve-year-old Ryan exercised a "reasonable and knowledgeable" preference to live with his father in Fargo. As a consequence of this preference, Ryan was separated from his younger brother. While we have condoned divided custody, we have done so cautiously, always recognizing that it is a solution called for by special circumstances. *E.g., Gravning v. Gravning*, 389 N.W.2d 621 (N.D.1986). The court did not itself interview Ryan. Instead, it depended on Jim's testimony and that of the experts to whom Ryan voiced his preference, although the trial judge apparently disregarded Dr. Offutt's warning to give no weight to that preference.

■ The preference of a child who is capable of intelligently choosing between his parents for custody is a relevant factor in determining the best interest of the child. NDCC § 14–09–06.2(1)(i); *Mertz v. Mertz*, 439 N.W.2d 94 (N.D.1989); *compare with Bergstrom v. Bergstrom*, 296 N.W.2d 490 (N.D.1980). We decided *Bergstrom* without reference to NDCC § 14–09–06.2, and without analysis of that statute. We held that a nine-year-old child's preference is a "significant factor", which must be given weight, even if the trial judge finds the preference to have been coerced by the noncustodial parent. *Bergstrom* has been substantially modified by our subsequent interpretation of section 14–09–06.2(1)(i). *E.g., Mertz, supra; Thomas, supra; Novak v. Novak*, 441 N.W.2d 656 (N.D.1989). Now, a child's preference to live with a noncustodial parent must be treated with care because a preference "may ... be motivated by goals and ambitions which undermine the significance of that preference...." *Mertz, supra* at 96–97 n. 2. Thus, the preference is only one factor to consider in a custody decision and "is not usually determinative." *Novak, supra* at 658; *see also Thomas, supra*.

■ Although age is not the exclusive indicator of a child's maturity and capacity to make an intelligent choice, generally, a child's preference is entitled to more weight as he or she grows older. *See Mertz, supra*. And indeed, it would be foolhardy to ignore the input of an older teenager's firmly held preference in the resolution of his or her custody. But, a child's preference, in a custody modification proceeding, to remain where his friends are and where his familiar school and community are, while "understandable," should not dictate custody when that child is twelve years old. *See, e.g., Thomas, supra* at 435; *Novak, supra*. Indeed, that sort of preference is all but predictable. *Thomas, supra*. A twelve-year-old's desire to remain involved in hometown sports activities is a "goal[ ] and ambition[ ]," *Mertz, supra* at 97 n. 2, that cannot trump the superior benefits to his best interests that we have recognized to inhere in the finality of litigation and the stability

of the ongoing custodial relationship. *See, e.g., Delzer, supra; Thomas, supra.* In recognizing the stability of Ryan's relationship with Cathy and also recognizing that Cathy's moral fitness was unencumbered by the behavioral disorder from which Jim suffers, but still deciding that a change of custody was required, we believe the trial court clearly erred in its consideration of the statutory factors by proceeding as though this were an original divorce proceeding, *see Delzer, supra,* and by "minimiz[ing] the overriding significance of the 'continuous and uninterrupted relationship that has been important' to [Ryan's] development as a happy, well-adjusted child." *Blotske, supra* at 611.

We conclude that the decision to change custody was induced by an erroneous view of the law and, therefore, was clearly erroneous. Reversed and remanded.

MESCHKE and SANDSTROM, JJ., concur.

VANDE WALLE, Chief Justice, dissenting.

I might not have reached the same decision as the trial court in this instance, but I am reluctant to reverse the trial court in a matter in which there is not clearly a "right" or a "wrong" solution. In addition, I write separately to note my concern with the majority's analysis which appears to imply that because Cathy's move and remarriage may not alone be sufficient to compel a change of custody, they are no longer to be considered. Standing alone they may not be sufficient, but they surely remain a part of the mix of circumstances to be considered with the other existing circumstances in reaching a decision.

Cases involving factual precedents are of limited value. *Blotske v. Leidholm,* 487 N.W.2d 607 (N.D.1992) and *Delzer v. Winn,* 491 N.W.2d 741 (N.D.1992), are significant but not controlling. They serve only to point out the obvious, i.e., the same factors do not necessarily deserve nor receive the same weight in each case. The factor which may be controlling in one instance may not be as significant in another instance. *Blotske* involved a change of custody by the trial court because of the interference by the custodial parent with the visitation rights of the noncustodial parent. We reversed. Two of the justices concurred in the result because "visitation problems are 'better remedied at first by resort to a more rigid visitation schedule, rather then a change of custody.'" 487 N.W.2d at 612 (Vande Walle and Johnson, JJ., concurring specially). Chief Justice Ralph Erickstad concurred in the result noting his concern that the majority opinion "has over emphasized the importance we have previously accorded the continuity of the custodial parent child relationship." 487 N.W.2d at 613 (Erickstad, C.J., concurring in the result).

*Delzer* produced the opposite result from this court, i.e., we reversed a court order changing custody because the positive changes in the noncustodial parents life did warrant a change of custody interrupting the continuity and stability of the present custodial arrangement. Two Justices signed the majority, one Justice concurred specially, and two Justices dissented.

If these cases are illustrative of anything, it is that this court should not attempt to substitute its judgment for that of the trial court, even if we disagree with the result, where the trial court has reached a reasoned decision that does not rely on impermissible factors. I recognize that such an approach may make the trial court's decision nearly nonreviewable. Perhaps that is the way it should be where we have no opportunity to view the parties and there is no clearly "right" or "wrong" solution.

Finally, insofar as the preference of the child is concerned, I adhere to my position that judges should not "trivialize the preference of a 13–year–old child" to remain with a parent in a city where he has lived all of his natural life, and where he is close to extended family. *Novak v. Novak,* 441 N.W.2d 656 at 659 (N.D.1989) [Vande Walle, J., concurring specially]. Despite my concern in that case, I concurred in the result affirming the trial court's decision, recognizing that "the preference is not controlling." *Id.* We should also recognize

here that no one factor is controlling and affirm the trial court.

NEUMANN, Justice, dissenting.

I respectfully dissent.

I agree with everything this Court said in *Blotske v. Leidholm,* 487 N.W.2d 607 (N.D.1992), and *Delzer v. Winn,* 491 N.W.2d 741 (N.D.1992), regarding the importance of maintaining a stable relationship between a child and the custodial parent, and I agree that there should be a presumption in favor of maintaining such a relationship. *Id.* at 747–49 (special concurrence by J. Levine).

But, in this case, the custodial parent has elected to move to a new town with a new school system, and to acquire a new spouse, all at once. It is difficult to imagine what more could be done to *destabilize* the lives of her children. While I do not suggest that custodial parents cannot move or remarry, I certainly think that the presumption favoring stability can be largely offset when such destabilizing life choices are made.

Were these the only facts presented to the trial court, I probably would not dissent. At most, the destabilizing effect of the move and the remarriage can only cancel the presumption in favor of stability, and, as Justice Levine wrote in her concurrence in *Delzer,* "we ought to resolve close cases in favor of continuing the custody with the custodial parent in order to protect the desired continuity...." *Id.* at 747. But here we have the additional factor of expert testimony recommending the custodial change. While I still might not have reached the same conclusion as the trial court, that, I am told by my new colleagues, is not the standard of review in this Court. Applying the appropriate standard, once the presumption favoring stability is cancelled by Catherine's destabilizing choices, and the expert testimony is considered, I cannot say that I am left with a definite and firm conviction that a mistake has been made. I would affirm.