Joel L. LEPPERT, Plaintiff
and Appellant,

v.

Quinta R. LEPPERT, Defendant
and Appellee.

Civ. No. 930248.

Supreme Court of North Dakota.

July 8, 1994.

Joseph F. Larson II (argued), Jamestown, for plaintiff and appellant.

Quinta R. Leppert, pro se.

NEUMANN, Justice.

Joel Leppert appeals from a divorce judgment awarding physical custody of his three youngest children to their mother, Quinta Leppert. We reverse and remand to the district court.

Joel and Quinta were married June 18, 1984. Five children were born of this marriage: James J. Leppert, born August 7, 1985, Stephanie J. Leppert, born May 25, 1987, Mary A. Leppert, born November 10, 1988, Thomas A. Leppert, born March 12, 1990, and Michele S. Leppert, born May 20, 1991. Joel filed for divorce on November 5, 1991. On November 6, 1991, Judge Gordon Hoberg issued an interim order granting temporary physical custody of the five children to Joel. On January 14, 1992, Judge Mikal Simonson issued an amended order granting temporary physical custody of the three youngest children to Quinta, with the physical custody of the two older children alternating between the parents on a bi-monthly basis.

The divorce trial was held on January 25, 26, and 27, 1993, and March 11 and 12, 1993. A variety of witnesses testified during the trial, including: both parents, Joel and Quinta Leppert; both paternal grandparents, Roger and Delores Leppert; Quinta's father, Gordon Winrod; James and Stephanie's teachers, Kristi Kumpf and Deborah Schott; Joel's brothers; Quinta's sisters and brothers; and the court appointed guardian ad litem, Dr. Robert Packard.

The guardian recommended custody of all five of the children should be with Joel, allowing for limited periods of visitation with Quinta. Concluding his report, the guardian stated "Quinta, despite her many admirable traits, is likely to provide parenting that is in several crucial respects, extremely dangerous to the children's psychological and emotional health, personality and characterological development, their physical well being and even their life."

One of the guardian's primary concerns was the harmful impact of Quinta's beliefs and resulting actions. Specifically, Quinta is a devout follower of the teachings of her father, Gordon Winrod (Winrod). Her father is the supreme leader of his own religious sect known as Our Savior's Church. In all, Gordon Winrod has about 100 followers. His church is not affiliated with any religious denomination, but purports to follow the teachings of the Bible.

Winrod and his followers believe there are only two types of people in the world: God's enemies, and those who are obedient to God. Those who do not follow Winrod's teachings

are not obedient to God, and they are consequently evil, and are to be hated as God's enemies.[1] Testimony at trial stated Winrod teaches lying to God's enemies, stealing from God's enemies, and violent behavior toward God's enemies. He also rejects the authority of governments, and his followers therefore refuse to pay taxes, refuse to register with selective service, ignore hunting and fishing regulations, and refuse to buy liability insurance on their vehicles as required by law. Quinta believes she has a duty to raise her children to follow Winrod. She insists that her children adopt all of his teachings and beliefs.

Joel was at one time a follower of Winrod, but has since stopped following his teachings. Since the marital separation, Quinta has moved to live with her father and several of his followers in a commune-like residence in Gainsville, Missouri. Joel has continued to live and work on the Leppert family farm in Dickey, North Dakota.

Prior to the separation, Quinta homeschooled the two oldest children. Since the separation, Joel enrolled the two oldest children in public school in Jud, North Dakota. When the children enrolled in classes, evaluation assessments showed James' reading and writing skills were significantly below the norm for his age.[2] The children's social skills lagged far behind those of their classmates.[3]

Testimony was introduced at trial that supported Joel's contention that Quinta was attempting to poison the children's relationship with Joel and his family. Tape recorded telephone conversations between Quinta and the two oldest children, James and Stephanie, include statements by Quinta, such as:

"... [Y]our daddy's such a pin head ..., birds of a feather flock together so do pigs and swine, that's the way your father is, he's a pig and he's a swine...."

\* \* \* \* \* \*

"... You got to push him [ (Joel) ] just like he's two years old cause that's all he is he's just a little a two year old. You know I thought some day maybe he would grow up so I waited for seven years but all he did was grow hideous that's all he did, so you know if I had known from day one that I had to grow up a little boy maybe I could have done it, if I had a belt I could have beat him every day just ... like you do little kids maybe he would have grown up someday but instead his heart rotted out till he's an evil man now, just evil. That's all he did was rot away, he's just wicked, evil and hideous, rebellious, and satanic and I don't know what ever other word you want to invent that's all he is. Well that's what his mother wanted him to be, she wanted him to be evil like she is...."

\* \* \* \* \* \*

"... I can tell you who's evil, it's that hideous woman and that hideous father of yours and that all hideous crew up there is a bunch of hideous evil workers.... [T]hose hideous Lepperts up there are tearing the world apart as fast as they can right along with the rest of the world...."

\* \* \* \* \* \*

"... Ya that's a real sweet little lie he [ (Joel) ] puts in your ears I suppose. He's just a sweet little liar, he sweet little lied to me for seven years...."

\* \* \* \* \* \*

1. A major theme in Winrod's teaching is to hate "Jews," and supporters of "Jews." Persons who do not agree with Winrod's interpretation of the Bible are considered supporters of "Jews" and therefore are to be hated. Of special note, it appears an individual can be a "Jew" regardless of religious heritage, and without practicing Judaism. For example, a Catholic priest could be a "Jew."

2. Testimony of teacher Kristi Kumpf included: "In math, [James] was up to a second grade level and had no problem with that. Reading, I'm not sure that he ever opened a reading book before because he had no idea how sentences were put together, which is way below first grade level. He had reading-wise maybe three words, four words that he could write for me."

3. Kristi Kumpf further testified: "When [Stephanie and James] first came to school, they didn't interact at all with other children. They were shy, withdrawn. When I questioned them, they wouldn't answer. And Joel was there the first day so most of the questions were targeted to him because they wouldn't answer when I asked them questions. And that was for the first maybe week or two."

". . . [Delores Leppert is] wicked and evil, and I'm gonna talk like that and your daddy can hear it whether he likes it or not. She's evil and she's made him evil, and your Uncle Tim is evil and Danny's evil and they're evil there."

Joel also testified that the younger children started to exhibit behavior that suggests Quinta is poisoning them against Joel as well.

Home studies were conducted both in Quinta's home in Missouri, and Joel's home in North Dakota. The results of the studies were that both households would be adequate for raising the five children.

Upon completion of the trial, a memorandum opinion was issued on March 30, 1993. Quinta was granted custody of the three youngest children, and Joel was granted custody of the two oldest. The two oldest children were to visit Quinta for their entire winter holiday vacation, and from July 1 through August 31 of each year. The three youngest children would visit with Joel for eight hours each year: two hours each time he dropped off the older children, and two hours each time he picked them up. The findings of fact, conclusions of law, and order for judgment were entered on May 28, 1993. The judgment was entered on June 1, 1993. This timely appeal followed.

Two issues are raised on appeal: first, whether the district court's decision to grant custody of the three youngest children to Quinta was clearly erroneous, and second, whether the district court's decision regarding visitation was clearly erroneous. Since we hold the custody award was clearly erroneous, we remand for the district court to redetermine child support and visitation.

## SCOPE OF REVIEW

 Child custody determinations are findings of fact. N.D.R.Civ.P. Rule 52(a); e.g., Weber v. Weber, 512 N.W.2d 723, 726 (N.D.1994). On appeal, findings of fact are not disturbed unless clearly erroneous. Rule 52(a); e.g., Weber, 512 N.W.2d at 726. "A finding of fact is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made, or if the finding was induced by an erroneous view of the law." Reede v. Steen,

461 N.W.2d 438, 440 (N.D.1990) (citing Mertz v. Mertz, 439 N.W.2d 94, 96 (N.D.1989).

## BEST INTERESTS

 Joel argues that the trial court clearly made a mistake when it awarded custody of the three youngest children to Quinta. Specifically, he argues the court erred when it refused to consider the harmful impact of Quinta's beliefs when determining the best interests of the children. We agree.

In its memorandum opinion, the trial court clearly addressed each of the enumerated factors of our best interests statute. NDCC § 14-09-06.2. Subsection (f) of the best interests statute is entitled "moral fitness of the parents." See § 14-09-06.2(1)(f). Addressing this subsection, quoting Hanson v. Hanson, 404 N.W.2d 460 (N.D.1987), the district court stated "that physical and [sic] emotional harm must be clearly shown, before religious beliefs may become a determining factor" in the best interests of the child analysis, but went on to find that there was not a clear showing of physical and emotional harm to the children from Quinta's practices and beliefs. We cannot agree. The guardian's report unequivocally stated that Quinta's parenting, because of her beliefs, constituted an extreme danger to the children, both physically and emotionally. Based upon such a record, the district court's finding is clearly erroneous.

 Although we agree with the district court that Quinta must not be discounted from consideration as a custodial parent simply because of her religious beliefs, this does not mean her religiously motivated actions, which are emotionally and physically harmful to the children, should be ignored when determining the children's best interests. Such a holding would immunize from consideration all religiously motivated acts, no matter what their impact on the children. Carl E. Schneider, Religion and Child Custody, 25 U.Mich.J.L.Ref. 879, 888 (1992). Almost all of the behavior of members of "other-worldly" sects would be excluded from consideration. Id. Not only would we be ignoring the best interests of the child, see Burnham v. Burnham, 208 Neb. 498, 304 N.W.2d 58, 61

(1981) ("[t]o hold that a court may not consider religious factors under any circumstances would blind courts to important elements bearing on the best interests of the child"), but the "worldly" parent would be comparatively disadvantaged. Schneider, *supra*, at 888.

▪ Consideration of the harmful impact of a parent's beliefs when determining the best interests of the child is in no way intended to punish parents. "A punishment is intended as a judgment of someone who has done something wrong. It seeks to condemn behavior, to prevent its repetition, and to deter others from emulating it." Schneider, *supra*, at 883. To the contrary, the goal in custody determinations is to foster the health and well-being of the child, not to punish either of the parents.

▪ The only reason for any consideration of religious beliefs when determining the best interests of the child is to take into account any harmful impact the belief system may have on the child. The best interests factors enumerated in § 14–09–06.2 are secular in nature, and the courts' functions do not include determining the road to salvation. Although secular courts have no place deciding one religion is better than another, Schneider, *supra*, at 884, they do have the duty of objectively determining whether a belief system's secular effects are likely to cause physical or emotional harm to children. We acknowledge that, ultimately, secular courts may not fully accommodate the desires of those who wholly reject secular standards. Schneider, *supra*, at 905. Remedying a conflict such as that, however, is beyond the scope of this appeal.

There are factors the trial court appeared to ignore in the best interests analysis because they were religiously motivated. Applying the correct standard for considering the adverse impact that Quinta's beliefs are likely to have on the children, it is in the best interests of all five children that their physical custody be with Joel.

## SPLIT CUSTODY

▪ Joel also argues that the trial court erred when it separated the three youngest children from the two oldest because it is not in the best interests of the younger children to be separated from their siblings. Although split custody is not flatly prohibited, as a general rule we do not look favorably upon separating siblings in custody cases. *Freed v. Freed*, 454 N.W.2d 516, 519 (N.D. 1990). Jay M. Zitter, Annotation, *Child Custody: Separating Children by Custody Awards to Different Parents—Post–1975 Cases*, 67 A.L.R.4th 354 (1989 & Supp.).

The exceptional circumstances that have been present in our previous split custody cases are not present here. For example, in *Freed*, there was a large age difference between the split siblings, the older child was close to the age of emancipation and voiced a custody preference, the parents' residences were only a few miles apart from each other, and liberal visitation was granted by the court. 454 N.W.2d at 519–20.

Our concerns over the split custody arrangement are exacerbated by evidence Quinta may be poisoning the children's minds against Joel and his family. *See Olson v. Olson*, 361 N.W.2d 249, 251 (N.D.1985) ("Divorced parents and the respective grandparents should always exercise extreme caution to avoid poisoning the mind of the child toward the other parent or grandparent, particularly in cases of joint or split custody." (quoting *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980))). Such behavior by Quinta is an attack on part of the children's identities. To the extent it is believed, it tends to deprive a child of the emotional support of the non-custodial parent at a time when the child's need for such an emotional source is probably at its greatest.

## MODIFICATION

We are also concerned about what seems to be an intimation by the trial court that the custody arrangement was temporary or easily modifiable. The school-aged children were placed with their father, while the preschool children were placed in the custody of their mother, the trial court stating "[t]hey are of such tender years that it is likely that they do not understand their Grandfather's dogma and hopefully they will not be adversely affected at this time in their lives."

As of the date of this opinion, the youngest children are five, four, and three. The five-year-old is now of school age, while the youngest two will be of school age within two years. Whatever protection their tender years may provide is temporary and brief.

■ While original custody determinations depend solely upon the best interests of the child, a modification of an original custody determination can be made only after the trial court has first determined that a significant change of circumstances has occurred since the original custody award. *E.g., Johnson v. Johnson,* 480 N.W.2d 433, 435 (N.D. 1992). " 'Changed circumstances' are new facts which were unknown at the time of the prior custodial decree." *Von Bank v. Von Bank,* 443 N.W.2d 618, 619 (N.D.1989) (modification of custody); *see also Rueckert v. Rueckert,* 499 N.W.2d 863 (N.D.1993) (modification of support provisions); *Muehler v. Muehler,* 333 N.W.2d 432 (N.D.1983) (modification of support provisions). Upon requests to modify custody as each of the three youngest children reaches school age, Joel may run into opposition when he argues aging of the children was not contemplated at the time of the original divorce decree.

## TENDER YEARS DOCTRINE

■ Finally, we are concerned the trial court's decision may have been based at least in part on the tender years doctrine, a doctrine which has been repealed in North Dakota. *See* NDCC § 30-10-06 (repealed 1973); *e.g., Odegard v. Odegard,* 259 N.W.2d 484.(N.D.1977). The findings of fact include the following finding:

"Quinta shall have actual physical custody of Mary, Thomas and Michele because they need to be raised by their mother. They are of such tender years that it is likely that they do not understand their Grandfather's dogma and hopefully they will not be adversely affected at this time in their lives."

Although the mere mention of "tender years" is not cause for reversal, we are uneasy that it is preceded by the finding "[the children] need to be raised by their mother." The role of primary caretaker is gender neutral on its face. *Gravning v. Gravning,* 389 N.W.2d

621, 625 (N.D.1986) (Levine, J., dissenting). Notwithstanding the fact Quinta has been the primary caretaker, this is not the only consideration to be weighed in determining the best interests of the children. *E.g., Gross v. Gross,* 287 N.W.2d 457, 461 (N.D.1979); *see also Branson v. Branson,* 411 N.W.2d 395 (N.D.1987) (primary caretaker not awarded custody).

For these reasons, we reverse the district court and award physical custody of all five children to their father, Joel. This reversal necessitates changes be made in visitation and child support. We remand for these determinations.

MESCHKE, J., and WILLIAM M. BEEDE, Surrogate Judge, concur.

LEVINE, J., concurs in the result.

WILLIAM M. BEEDE, Surrogate Judge, sitting in place of SANDSTROM, J., disqualified.

VANDE WALLE, Chief Justice, concurring in the result.

Despite my reluctance to reverse a trial court in these matters, *see Barstad v. Barstad,* 499 N.W.2d 584, 589 (N.D.1993) [VandeWalle, C.J., dissenting], I concur in the result reached by the majority.

In reaching its decision in this case, the trial court relied on the statements in the majority opinion in *Hanson v. Hanson,* 404 N.W.2d 460 (N.D.1987), where the majority reversed the trial court's decision limiting religious topics during visitation with the father despite a finding by the trial court, based on evidence in the record, that the father's statements to the children about his beliefs concerning the mother's religion were emotionally damaging to the children. I dissented to that portion of the majority's decision reversing the trial court. *Hanson, supra* at 467 [VandeWalle, J., concurring in part and dissenting in part]. I join the majority's result today because it is apparent that the trial court was misled by the majority opinion in *Hanson* as to the evidence of physical or emotional harm to the child nec-

essary for religious beliefs to be a determining factor in its decision.